# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3667

_____

Tim Dempsey,                                    *
                                                *
    Plaintiff - Appellant,             *
                                                *   Appeal from the United States
v.                                              *   District Court for the
                                                *   District of Nebraska.
City of Omaha, a municipal                      *
corporation; Michael G. Fahey,                  *
Individually and in his Official                *
Capacity; Paul Landow, Individually             *
and in his Official Capacity; Thomas            *
Marfisi, Individually and in his Official       *
Capacity,                                       *
                                                *
    Defendants - Appellees.            *

_____

Submitted: April 15, 2010
Filed: February 8, 2011

_____

Before LOKEN, BRIGHT and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Tim Dempsey, the former Chief of Police for Elkhorn, Nebraska, appeals the district court's denial of his First Amendment retaliation claims against the City of Omaha. The events giving rise to this action occurred in the context of Omaha's contested and protracted annexation of Elkhorn. Throughout and following this process, Omaha hired most Elkhorn employees who sought employment with Omaha.

Dempsey argues he participated in protected speech and Omaha retaliated against him based on his speech by not hiring him. The district court granted summary judgment in favor of the defendants. We reverse in part.

I.    Background

Omaha passed an ordinance to annex Elkhorn in March 2005. Legal battles held up the annexation until March 1, 2007. See City of Elkhorn v. City of Omaha, 725 N.W.2d 792 (Neb. 2007). At that time, the Nebraska Supreme Court entered judgment rejecting the final legal challenges to the annexation. Id. Dempsey was the Elkhorn Chief of Police from September 1999 through the annexation and was considered a management employee by Elkhorn. Prior to finalization of the annexation, Dempsey spoke on several occasions with Omaha employees in an effort to secure employment with Omaha.

In April 2006, Dempsey spoke with Paul Landow, the Omaha Mayor's Chief of Staff, about the potential fate of Elkhorn employees in the event of a successful annexation. Landow asked Dempsey about Dempsey's own plans, and Dempsey responded that he wanted to work another two or three years until his wife could retire. Dempsey does not claim to recall Landow's specific response, but asserts Landow said nothing leading him to believe he would not be employed by Omaha.

On October 13, 2006, Thomas Marfisi, Omaha's Human Resources Director, sent a letter to Elkhorn's employees stating that Omaha would be "interested in hiring qualified management employees that express an interest in applying for available positions" and that "[a]ny decision to hire management employees will be made on a case by case basis and will be based on the needs of Omaha at the time of the application." The letter instructed Elkhorn employees to call Marfisi if interested in employment with Omaha. Shortly thereafter, Dempsey called Marfisi and asked what steps he should take to obtain employment with Omaha. Marfisi told Dempsey to

submit a resume. Dempsey confirmed the phone call with an email, sent Marfisi his resume, and informed Marfisi of his current salary and benefits.

In early November, the Omaha World-Herald published an article discussing a hiring freeze at Omaha. Marfisi then sent a letter to Elkhorn employees stating the freeze did not apply to Elkhorn employees and "Omaha continues to have every expectation of hiring Elkhorn's employees."

Also in late October or early November 2006, Omaha delivered fourteen employment forms to the Elkhorn Police Department. Dempsey gave the forms to his thirteen police officers and completed a form himself. Dempsey emailed a copy of the form to Marfisi on November 9 and mailed the original on November 13. The form was lengthy and was entitled "Personal History Statement." The form was not an application for a specific position, but it is undisputed the purpose for submitting the form was to seek employment with Omaha.

In December 2006, Dempsey talked to Omaha Police Chief Thomas Warren at a 911 User Board meeting. Warren asked about Dempsey's employment plans and asked, "You're not interested in working on the streets are you?" Dempsey responded, "Tom, I'm 62 years old. I can't work in a cruiser car." In an affidavit in this lawsuit, however, Dempsey stated, "At no time did I tell Chief Warren that I would not accept an entry level position. I simply advised him that I could not work as a regular cruiser officer." The record does not reflect which positions or officer rankings within the Omaha Police Department were entry level or required "work in a cruiser car."

In January 2007, Dempsey again met with Warren and talked about the transfer of police officers to Omaha. Warren asked Dempsey "what are they going to do with you?" According to Dempsey, Warren was surprised that Dempsey hadn't heard back from Marfisi. This prompted Dempsey to contact Marfisi again. Dempsey sent

Marfisi an email discussing his meeting with Warren and expressing concern that Warren appeared not to have received a copy of Dempsey's personal-history form or resume. In the email, Dempsey referenced other Elkhorn management employees who had progressed in their own respective job searches with Omaha and asked Marfisi for a response regarding his employment prospects.

Marfisi did not respond directly to Dempsey, but instead, talked to Landow, who met with Dempsey in late January. Marfisi later characterized the email from Dempsey as a "plea for help." Marfisi admits that, by the time he received the email from Dempsey, he had twice met with groups of Elkhorn police officers and had told the officers " I thought [Dempsey] would get a job with the City" and "Landow was very interested in trying and very active in trying to find a job for Tim Dempsey."

At the late-January meeting between Dempsey and Landow, Landow asked Dempsey why Dempsey had hired a man named Dave Friend to work part time in the Elkhorn Police Department. Dempsey said he was surprised Landow asked about Friend and that Friend had run unsuccessfully against Landow's boss, Mayor Fahey, for the office of Mayor of Omaha. Dempsey responded that he had known Friend for twenty years and Friend had previously worked as an Omaha police officer. Landow also described a work situation to Dempsey and asked Dempsey how he would handle the situation. Landow then asked Dempsey what he wanted to do, and Dempsey again told Landow that he wanted to work two or three more years. Dempsey told Landow his salary was approximately $75,000. Landow stated he thought Dempsey's salary was in the $90,000s, he would try to find a job for Dempsey, and it would be "no problem" to find a job. Landow did not tell Dempsey to take further action or apply for any specific job. According to Marfisi, even though Marfisi was Omaha's Human Resources Director, Landow possessed more authority than Marfisi for the purpose of hiring Dempsey because Landow had the authority to add "unclassified" positions that paid above $60,000.

On February 20, Omaha informed seven of Elkhorn's thirteen police officers that they would not be hired by Omaha. A reporter from the Omaha World Herald talked to Landow who told the reporter the seven officers had failed background or qualification investigations. A reporter then contacted Dempsey for comments regarding the denial of employment to the seven officers. Dempsey's response was printed in the paper the following day. The article was entitled "Police Hiring Decision Criticized." It began with the sentence, "Elkhorn leaders expressed dismay today over Omaha's decision to hire fewer than half of Elkhorn's police officers." It quoted the Elkhorn city attorney as being "contemptuous" of the decision. The article continued, "Elkhorn Police Chief Tim Dempsey said the seven officers who didn't make the cut were very disappointed. 'They've been coming to work every day, doing a good job and thought they'd have a job.'" Finally the article stated that Dempsey had not been offered a job and noted, "Dempsey, 63, said it was possible that he would be offered a job elsewhere in Omaha city government."

On February 22, a reporter again contacted Dempsey to ask about the officer hirings. An article printed the following day, February 23, cited criticism of Omaha by Dempsey and a response from Landow. The article was entitled "Officers Disqualified Without Job Reviews." It began, "Omaha never asked Elkhorn's police chief how his force performed on the job, but the city ruled out hiring more than half of Elkhorn's officers." The relevant statements from Dempsey relayed in the article were a general criticism of Omaha's process. The article stated, "Dempsey said he was surprised he was not asked for a review of his 13 officers' performances. It would make sense, Dempsey said, that their past performances would indicate how they would perform in the future." The article quoted Dempsey as saying he was "baffled." It also contained a response from Landow who refused to identify the information used to disqualify the seven officers. It also quoted Landow as indicating that he believed, based on conversations with Dempsey, that "Dempsey seemed aware that some of his officers had background problems."

On February 27, 2007, Dempsey met with personnel from the Omaha Police Department to discuss annexation. Following the meeting, Dempsey sent an email to the seven Elkhorn officers not hired by Omaha, telling them they would be required to turn in their equipment following annexation. The seven officers sent letters to Dempsey claiming rights of continued employment based on a collective bargaining agreement and a state statute concerning annexations. The officers refused to turn over their equipment unless terminated in writing by a superior officer, citing the need to remain "prepared to respond to a public emergency." Dempsey passed the letters on to Omaha officials, and Marfisi twice called Dempsey, saying, "This is a bullshit deal." Marfisi told Dempsey to expect a letter from Omaha's attorney to pass on to the officers. Dempsey, however, refused, stating that until the annexation was complete, he did not feel it would be appropriate for him to have the officers relinquish their equipment.

On March 1, 2007, Dempsey met with Don Thorson, the Omaha Mayor's Deputy Chief of Staff. Dempsey described their meeting, stating, "He [told] me it was his task to find me a job." The men discussed the possibility of an unspecified position with Homeland Security or emergency management, and Thorson told Dempsey he would try to find Dempsey a job. On March 12, however, Dempsey received a letter from Landow telling him that there was no position available for Dempsey in Omaha. The letter stated, "Should something come up in the future, I will be in touch."

Eventually Dempsey initiated the present action against Omaha, Fahey, Landow, and Marfisi. Dempsey alleged a due process violation and First Amendment retaliation. In support of his First Amendment claim, Dempsey asserted that his comments to the Omaha World Herald were protected speech. He also claimed his refusal to order his officers to relinquish their equipment was protected speech. He alleged the defendants had repeatedly assured him they were working to find him a position but ceased their efforts and refused to hire him in retaliation for his protected

speech. Dempsey alleged in the alternative that he became an Omaha employee by operation of law and that Omaha terminated his employment via the March 12 letter.

In discovery, it was revealed that Omaha filled the following positions in its police department at times relevant to the present case:

(1)    three police captains on February 11, 2007 at annual salaries of $81,519

(2)    five police lieutenants on February 11, 2007 at annual salaries of $70,459

(3)    five police sergeants on February 11, 2007 at annual salaries of $60,323

(4)    one police sergeant on February 27, 2007 at an annual salary of $60,323

(4)    one police sergeant on March 11, 2007 at an annual salary of $60,323

(5)    one police lieutenant on April 9, 2007 at an annual salary of $70,459

(6)    two police sergeants on April 22, 2007 at annual salaries of $60,323

(7)    one police sergeant on May 10, 2007 at an annual salary of $60,323

(8)    one police lieutenant on July 1, 2007 at an annual salary of $70,459

(9)    one police sergeant on July 1, 2007 at an annual salary of $60,323

The parties have not pointed to anything in the record indicating that these positions required work in a cruiser or were considered "entry-level" positions. It was also revealed that all Elkhorn employees who sought employment with Omaha received job offers—other than Dempsey and the seven officers. It is undisputed that Dempsey was the only Elkhorn employee, management or otherwise, who sought employment with Omaha and was denied employment for the purported reason that no position was available. Of fifty-five Elkhorn employees at the time of annexation, forty-three obtained employment with Omaha. The remaining twelve employees

included Dempsey and the seven police officers mentioned above, three employees who did not apply to work with Omaha, one who declined a position with Omaha.

The defendants moved for summary judgment. Before the district court ruled on the motion, a court addressed similar due process claims in a separate lawsuit between the seven officers and Omaha. There, the court rejected the due process theory. Barnes v. City of Omaha, 574 F.3d 1003, 1008 (8th Cir. 2009). Dempsey then voluntarily dismissed his own due process claim. Accordingly, the district court in the present case addressed only Dempsey's First Amendment claims.

In determining whether Dempsey had participated in protected speech, the court looked at Dempsey's speech to the newspaper and at the "speech" regarding Marfisi. Applying Garcetti v. Ceballos, 547 U.S. 410 (2006), the court first stated Dempsey had spoken as a citizen and not as an employee because Omaha was not his employer at the time of any of the purportedly protected speech. The court then held the speech to Marfisi did not relate to a matter of public concern. The court assumed without deciding that the speech to the newspaper related to a matter of public concern.

The court next found no adverse employment action because Dempsey was never an Omaha employee. The court held in the alternative that even if Dempsey had suffered an adverse employment action, Dempsey failed to create a triable question of fact regarding the existence of a causal connection between his speech and any adverse action.

The individual defendants asserted qualified immunity in the district court. Given the court's resolution of the substantive issues, however, it did not reach the question of qualified immunity for the individual defendants.

## II. Discussion

We review a grant of summary judgment de novo, viewing the record in the light most favorable to Dempsey, the non-moving party, and drawing all reasonable inferences in his favor. Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1112–13 (8th Cir. 2009). To state a prima facie case for first amendment retaliation, it is necessary for Dempsey to show: (A) he participated in protected speech; (B) the defendants took an adverse employment action against him; and (C) the speech was a substantial or motivating factor in the defendants' decision to take the adverse action. Id. at 1113; Morris v. City of Chillicothe, 512 F.3d 1013, 1018–20 (8th Cir. 2008).[1]

### A. Protected Speech

A public employee's constitutional protections from employer discipline based on the employee's speech are limited to statements the employee makes (1) as a citizen (2) on matters of public concern. See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006);

---

[1]The parties focus their arguments on the prima facie case and do not address whether the tripartite burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as applied in Morris, or the "same-decision" framework of Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274 (1977), as applied in Davison v. City of Minneapolis, 490 F.3d 648 (8th Cir. 2007), should guide the remainder of the analysis in this case. See Davison, 490 F.3d at 655 & n.5 (discussing our court's inconsistent treatment of the different analyses and applying Mt. Healthy); see also id. at 662–65 (Colloton, J., dissenting) (concluding the McDonnell Douglas framework should apply). Because the district court held Dempsey failed to make out a prima facie case, it did not reach this question, and neither party advocates the application of a particular framework. Rather, the parties argue generally in terms of causation. In this setting, we are mindful of the fact that the Mt. Healthy framework, like the McDonnell Douglas framework, "is a helpful tool, but it is still just a tool." Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996) (describing the prima facie case framework). Under either approach, liability is conditioned on proof that a retaliatory animus "was a substantial or motivating factor." This is the extent of the causation question we address today.

Davenport, 553 F.3d at 1113. Speech that satisfies Garcetti's two-prong test is not free from employer regulation unless the employee's "right to free speech outweighs the [employer's] interest in promoting the efficiency of its public services." Davenport, 553 F.3d at 1113; see also Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."). The boundaries of the two Garcetti inquiries are not defined in concrete terms, and as with most balancing exercises, reasonable minds may disagree as to the outcome of the Pickering test. See, e.g., Sexton v. Martin, 210 F.3d 905, 914 (8th Cir. 2000) ("[I]n many free speech cases the outcome of the Pickering balancing test would be unclear to a reasonable official."); Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1207 (10th Cir. 2007) ("There is no easy formula for 'weighing' an employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment.") (citation omitted). Resolution of these questions are matters of law that we review *de novo*, but underlying factual disputes related to these questions must be left for the jury. See Connick v. Myers, 461 U.S. 138, 148 n.7 (1983) ("The inquiry into the protected status of speech is one of law, not fact."); Casey v. City of Cabool, 12 F.3d 799, 803 (8th Cir. 1993) ("[A]ny underlying factual disputes concerning whether the speech at issue [is] protected should [be] submitted to the jury.")

In the present case, we face these three separate questions and also the threshold inquiry of whether Garcetti and Pickering apply *at all* in the unique context of this case: Omaha is the entity accused of taking retaliatory action, but Omaha was not actually Dempsey's employer at the time he made the allegedly protected statements.[2]

---

[2]In his complaint, Dempsey alleged alternative legal theories, asserting that (1) he became Omaha's employee by operation of law through the annexation process and was terminated by Omaha due to his protected speech, or (2) he was Elkhorn's employee until annexation was complete and Omaha subsequently refused to hire him

This inquiry may be outcome dispositive in some cases because, if the public-employer standards of <u>Garcetti</u> and <u>Pickering</u> do not apply, a plaintiff is entitled to the full panoply of First Amendment protections against governmental retribution. <u>See</u> <u>Wishnatsky v. Rovner</u>, 433 F.3d 608, 611–12 (8th Cir. 2006) (reinstating a case involving the denial of access to government services based on speech and stating, "Discrimination against speech because of its message is presumed to be unconstitutional, and viewpoint discrimination is an egregious form of content discrimination") (internal citations and quotation marks omitted).[3]

---

because of his protected speech. It is permissible to plead in the alternative, and it is understandable why Dempsey did so in the present case. The seven officers presented non-frivolous due process claims in their separate litigation against Omaha, and Dempsey presented a similar claim below. Complicating the due process arguments were outstanding questions of law regarding the interplay between Nebraska statutes dealing with the assumption of contractual obligations by the annexing city, and the status of the target cities' employees. As already noted, the due process claims did not prevail in the separate litigation, and Dempsey abandoned his own due process claim before the district court. Regardless, given the uncertainty in the applicable law, it is clear why Dempsey took advantage of the permissible practice of pleading alternative legal conclusions.

Here, the alternative pleading led to a lack of clarity in the presentation of issues to the district court. Ultimately, however, we believe it is appropriate to analyze Dempsey's claim as a failure-to-hire claim. It is undisputed his position—Elkhorn Chief of Police—was eliminated through the annexation. Accordingly, whether the adverse action in the present case was merely the failure to move him to a new position within Omaha after he became an Omaha employee by operation of law, or whether Omaha simply refused to hire him, it is the refusal to hire or place him in a position that he alleges as adverse.

[3]We recognize it is questionable whether retaliation or discrimination is the appropriate label for use in this case. Perhaps if Dempsey had used the term discrimination the issue of <u>Garcetti</u> and <u>Pickering</u> might not have been raised. Given the manner in which the case is presented, however, we find use of the term retaliation inescapable. Nevertheless we acknowledge and agree with comments from another court that noted:

We address this threshold inquiry below and conclude that, in the limited context of this case, <u>Garcetti</u> and <u>Pickering</u> do not apply. We also hold in the alternative that, even if <u>Garcetti</u> and <u>Pickering</u> were applicable, Dempsey's comments to the newspaper reporter would qualify for protection as speech by a citizen that addresses a matter of public concern and has little ability to impede Omaha's efficient provision of public services.

### 1. Threshold Inquiry: Applicability of <u>Garcetti</u>

We can envision many situations where a public employee might speak in a manner deemed objectionable by governmental actors other than his or her actual employer. Examples include statements made by members of state–federal crime task forces or any multi-government or multi-agency organizations. In these types of joint ventures, it is possible that personnel oversight may be distributed or delegated, and governmental actors other than the speaker's actual employer may be in a position to retaliate against, or otherwise chill, speech. In such situations, where an employee who asserts First Amendment rights speaks against an entity other than his or her actual employer, a hard question arises: should courts analyze the purportedly protected speech and alleged adverse action under the standards that apply when a state actor has denied a government benefit based on a normal citizen's speech or under the standards for less-protected speech as per <u>Garcetti</u> and <u>Pickering</u>.

---

The word "retaliation" has the potential, realized here, to divert attention from the rule that both threats designed to deter future speech and penalties for past speech are forbidden. "Retaliation" as a legal theory comes from employment-discrimination suits. We have borrowed the word in cases where an employer punishes an employee on account of speech. Using one word for two kinds of claim has the potential to confuse. Because only a subset of viable first-amendment claims involves retaliatory discharge, it is generally best to avoid the word.

<u>Fairley v. Andrews</u>, 578 F.3d 518, 525 (7th Cir. 2009) (internal citations omitted).

-12-

In the present case, Dempsey argued the answer was simple and clear. The district court appears to have agreed, addressing the question in the context of Garcetti's "citizen speech or employee speech" inquiry. The court concluded:

> Dempsey's speech that is at issue here was not made in connection with any official duties as an employee of the City of Omaha. While he may have spoken in his official capacity as the Police Chief of the City of Elkhorn, he was not employed by the City of Omaha at the time he made the statements in question. *The balance between a plaintiff's right of free speech as a citizen and a defendant government entity's interest are not called into question where the government entity is not the employer.* Drawing all inferences in favor of Dempsey, the Court concludes that he spoke as a citizen.

(Emphasis added).

Although we agree with the district court's ultimate conclusion in this case, we do not necessarily agree that the inquiry will always be as straightforward as suggested by the district court. While this literal approach provides ease of application and clarity for employers and litigants, it leaves little room for employer control of speech within the setting of multi-employer ventures or task forces. The degree to which employers distribute and delegate authority over one another's employees presumably varies widely, and it is possible that the concerns addressed in Garcetti and Pickering merit consideration in such settings.

Here, however, we need not and do not purport to resolve this question in any context other than the limited facts at hand. The present case simply does not involve a situation where governments have come together in an ongoing cooperative spirit to achieve a common goal or where ongoing supervision of employees is delegated to a cooperating agency or government. Rather, the present case involves a hostile, politicized, and heavily resisted annexation of a small city by a larger city. The two years of litigation that held up the annexation are evidence of this fact. We simply do

-13-

not view the present case as analogous to the more difficult example of public joint ventures.

In this context, we find nothing in <u>Garcetti</u> or <u>Pickering</u> to suggest a non-employer should be entitled to control the speech of the target entity's employees. We see little potential benefit to the public's interest in the free flow of information or the efficient provision of government services from treating an annexing city as the *de facto* employer of the target city's employees. To hold otherwise would risk the suppression of information surrounding a political event: the expansion of one municipality and the dissolution of an other.

To the extent speech occurs when a political, government-changing act such as an annexation is not yet complete, the public has a strong interest in understanding the dynamics and consequences of the potential annexation. To the extent speech occurs when the annexation is actually, or effectively, complete, the public's interest continues: members of the public are entitled to learn about the practices of their newly and involuntarily acquired public officials. We hold that <u>Garcetti</u> simply does not apply to Dempsey's speech.[4]

2.      Speech as a Citizen

We write further, and in the alternative, because even if <u>Garcetti</u> were applicable where the alleged violator was not the employer, we would hold that

---

[4]We find it compelling that at least some of Omaha's actions, viewed in the light most favorable to Dempsey, were not in furtherance of providing efficient and uninterrupted public services, but necessarily would have detracted from the provision of such services. For example, it can hardly be argued that Omaha's interactions with Dempsey were strictly in furtherance of a "smooth transition" or the "uninterrupted" provision of public services when Omaha asked Dempsey to demand that his officers' relinquish their equipment *before* they ceased being Elkhorn employees.

Dempsey spoke as a citizen on a matter of public interest. The Supreme Court in Garcetti stated, "We hold that when public employees make statements pursuant to their *official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421 (emphasis added). The Court continued, "Restricting speech that owes its existence to a public employee's *professional responsibilities* does not infringe any liberties the employee might have enjoyed as a private citizen." Id. at 421–22 (emphasis added).

This seemingly straightforward and bright-line rule is less clear than it appears at first blush because the Court had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." Id. at 424. The Court spoke broadly of the need to balance the employers' control of operations and services with the public's access to the informed opinions and otherwise unavailable information held by public employees. Id. at 419–421. In doing so, the Court distinguished speech undertaken as part of an employee's "official duties" and "professional responsibilities" from speech that was merely related to employment or that occurred in the workplace. For example, the fact that the speech at issue in Garcetti occurred "inside his office, rather than publicly," and "concerned the subject matter of [the employee]'s employment . . ." was "nondispositive." Id. at 420–21. Because it was undisputed in Garcetti that the speech was pursuant to the employee's duties, the Court did not flesh out these distinctions. Id. at 424.

Subsequently, our court has had occasion to address this issue. In Bradley v. James, 479 F.3d 536 (8th Cir. 2007), we held that a police officer's "unsubstantiated comments" about another officer were not made as a citizen because the speaker made his allegations only in the context of an official investigation where he was duty bound to respond to the investigator's questions. Id. at 537–38. Similarly, in McGee v. Pub. Water Supply Dist. # 2, 471 F.3d 918 (8th Cir. 2006), we addressed First Amendment claims by the manager of a county water district who had spoken to a

board of directors against a particular project.  There, we looked to the manager's admission that his duties included advising the board "regarding regulatory and legal requirements."  <u>Id.</u> at 921.  We also noted that the manager had supervisory duties over the project at issue and that his speech to the board concerned legal issues surrounding the project.  Accordingly, we held he spoke as an employee rather than as a citizen.  <u>Id.</u>  In doing so, we said "determining the scope of an employee's official duties . . . is a practical inquiry that focuses on 'the duties an employee actually is expected to perform,' rather than his formal job description."  <u>Id.</u> (quoting <u>Garcetti</u>, 547 U.S. at 424–25.)  And in <u>Bailey v. Dep't of Elem. & Sec. Ed.</u>, 451 F.3d 514 (8th Cir. 2006), we illustrated the practical nature of this inquiry, finding a plaintiff spoke as an employee rather than as a citizen where he had asserted, "I consider any time I spend addressing this matter with you or the agency to be services I am giving the state as a consultant."  <u>Id.</u> at 520.

Recently, in <u>Bonn v. City of Omaha</u>, 623 F.3d 587 (8th Cir. 2010), we found employee speech rather than speech as a citizen and affirmed a district court's summary judgment against an employee's federal claims.  In <u>Bonn</u>, Omaha's Public Safety Auditor prepared a report describing traffic stops.  The report was critical of officers' actions, and the employee also made critical comments when contacted by the media.  Regarding the report itself, we noted that the employee admitted in an answer to an interrogatory that she prepared the report "as a function or official duty of [her] position as the Public Safety Auditor of the City of Omaha."  <u>Id.</u> at 592. Accordingly, we held the report was not speech as a citizen.  In holding that her statements to the press also served as employee speech rather than speech as a citizen, we emphasized that the employee spoke to the media pursuant to her official duties and that "[s]he acted in response to media inquiries *about a report that she published as part of her work as auditor . . . .*"  <u>Id.</u> at 593 (emphasis added).  <u>Bonn</u>, then, was similar to <u>Bradley</u>, <u>McGhee</u>, and <u>Bailey</u> where the speech at issue was pursuant to official duties.

In Davenport, the court analyzed two instances of speech. The court found employee speech in a context nearly identical to the official-inquiry response in Bradley. Davenport, 553 F.3d at 1113. The other occurrence, however, involved a report of alleged misuse of resources by a university's chief of public safety. As to this separate instance of speech, we said, "Davenport's duties did not include reporting either wrongdoing by a superior officer or a lack of resources. With regard to his 1999 statements, Davenport was speaking as a citizen on a matter of public concern." Id.

Against this backdrop, we view Dempsey's statements to the Omaha World Herald to be speech as a citizen rather than speech as an employee. Unlike the comments of a commanding uniformed officer at the scene of an emergency or a Public Safety Auditor answering questions about an official and personally authored report, Dempsey's comments to the reporter were informal and did not "take on the character of '[o]fficial communications.'" See, e.g., Foley v. Town of Randolph, 598 F.3d 1, 7–8 (1st Cir. 2010). While it is true that "there will be circumstances in which" employees' comments to the press may take on such a character, id. at 8, mere relationship between the subject matter of the speech and employment is insufficient to satisfy Garcetti. Here, the newspaper approached Dempsey because he was the police chief of Elkhorn and the complaining officers' ultimate boss. Dempsey admits he was merely answering the reporter's questions. These undisputed facts establish only that the reporter sought otherwise unavailable information from a person likely to possess that information. We find nothing in the record suggesting Dempsey's "official duties" or "professional responsibilities" required him to answer the reporter's questions about the officers' qualifications for employment with another municipality or discuss that other municipality's actions towards his officers. Garcetti, 547 U.S. at 421. Under Garcetti, a showing of a mere relationship to employment is insufficient to preclude protection. To hold otherwise would effectively eliminate the distinction between official-duty speech and job-related speech and render the cabining language of Garcetti meaningless.

On the other hand, if Garcetti were otherwise applicable, we would find Dempsey's "speech" regarding Marfisi and the efforts to have the seven officers relinquish their equipment prior to Omaha's assumption of control to be employee speech. Dempsey stated in a deposition that he thought what Marfisi was asking him to do was wrong and that it would be unsafe to effectively terminate the Elkhorn officers and leave Elkhorn short staffed before Omaha officially assumed public safety functions. To the extent, then, that Dempsey's actions in response to Marfisi's demands constituted speech, Dempsey took those actions to fulfill his duties of providing for the public's safety and managing the Elkhorn Police Department.

3. Speech on a Matter of Public Interest & Pickering Balancing

Regarding the subject matter of Dempsey's speech to the newspaper and the Pickering balance between the public's interest and the government entity's need to maintain efficient operations, we conclude the comments to the newspaper related to a matter of public concern and were, on balance, worthy of protection. As already noted, the annexation was a contested and litigated political issue. The fact that the newspaper repeatedly sought out information regarding treatment of the officers suggests the information was material to public discourse. Dempsey criticized Omaha's handling of employment related to the annexation, and "[c]riticism, no matter how obnoxious or offensive, of government officials and their policies clearly addresses matters of public concern." Casey v. City of Cabool, 12 F.3d 799, 802 (8th Cir. 1993). Further, given the fact that government operations by Elkhorn were winding down, there was little possibility of Dempsey's speech interfering with the efficient provision of services by the City of Elkhorn. Lindsey v. City of Orrick, 491 F.3d 892, 900 (8th Cir. 2007) ("[A] public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships.").[5]

---

[5]Another conceptual difficulty with application of Pickering and Garcetti in this case is the need to decide which municipality's operations are material to the balancing

-18-

Because we conclude in the alternative that <u>Garcetti</u> does not apply and that even if it applies, Dempsey's speech to the newspaper is protected, we must address the remaining elements of the prima facie case.

B.    Adverse Action

As discussed in footnote 2, we address only the failure-to-hire aspects of Dempsey's retalitation allegations. Omaha argues that, to the extent Dempsey alleges a failure-to-hire, Dempsey possessed no protected right to obtain employment with Omaha and, in any event, failed to apply for a specific position. We address these arguments in turn.

With a First Amendment failure-to-hire claim against a government entity, as with other cases dealing with purported denials of government benefits, it is not necessary for a plaintiff to show that he or she possessed an entitlement to the benefit such as a protected right to obtain employment. <u>See</u> <u>Rutan v. Republican Party of Ill.</u>, 497 U.S. 62, 71–72 (1990). The right at issue simply is not a due process right dependent upon the possession of a protected interest. Rather, it is the more generalized right not to suffer adverse consequences at the hands of a government entity based upon the exercise of a protected right. The Supreme Court has

---

inquiry: the target city's or the annexing city's. To the extent impact upon Omaha, the non-employer, could be viewed as material to the balancing inquiry, we view the comments by a non-employee such as Dempsey regarding Omaha's treatment of seven potential police officers to be of little consequence to Omaha's efficient and effective provision of public services. There is no suggestion Omaha's provision of public services was or was likely to be disturbed, and, given the relative sizes of Omaha's police force and the seven-member group of Elkhorn officers, any such disruption would seem unlikely. <u>See, e.g.</u>, <u>Davenport</u>, 553 F.3d at 1113 ("[T]he record fails to show that silencing Davenport's protected speech would advance the University's interest in promoting the efficiency of its public services.").

recognized this principle generally, and emphasized its importance in the context of the First Amendment, in particular:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests–especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which (it) could not command directly."

Perry v. Sindermann, 408 U.S. 593, 597 (1972) (quoting Speiser v. Randall, 357 U.S. 513, 526 (1958)). In Perry, the plaintiff was a non-tenured junior college teacher with no right to continuation of his year-to-year employment. In essence, the plaintiff in Perry was subject to rehire annually. We see no meaningful distinction between Dempsey seeking employment with Omaha and the plaintiff in Perry seeking employment for the start of a new school year. The Court in Perry made clear that no right to employment was required to state a First Amendment claim. Accordingly, the fact that Dempsey may have held no contractual or statutory right to employment with Omaha is not fatal to his claim. See id. ("[M]ost often, we have applied the principle to denials of public employment."); Calvit v. Minneapolis Pub. Sch., 122 F.3d 1112, 1118 (8th Cir. 1997) ("Even if the school district did not have an obligation to reassign him to Four Winds, the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.'" (quoting Perry, 408 U.S. at 597)).

It is undisputed that Dempsey failed to apply for a specific position. Omaha is correct that, typically, it is necessary for a plaintiff bringing a failure-to-hire claim to identify a specific job, show that the job was available, and show that he was qualified

for, and applied for, that job. See Green v. City of St. Louis, 507 F.3d 662, 666 (8th Cir. 2007); Chambers v. Wynne Sch. Dist., 909 F.2d 1214, 1216 (8th Cir. 1990).[6] There is an exception to the application requirement, however, where an employer had "some reason or duty to consider [the plaintiff] for the post." Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1105 n.13 (8th Cir. 1996). Although use of the phrase "some reason" suggests the exception is potentially broad, we previously have described the exception relatively narrowly. See, e.g., Chambers, 909 F.2d at 1217 (formal application may be excused "if the job opening was not officially posted or advertised and either (1) the plaintiff had no knowledge of the job from other sources until it was filled, or (2) the employer was aware of the plaintiff's interest in the job notwithstanding the plaintiff's failure to make a formal application"). At its heart, the exception is akin to an estoppel-type argument. It prevents an employer or prospective employer from asserting the absence of an application for a specific position as a defense when the absence of such an application was immaterial to the decision-making process or when the defendant was in large part responsible for the omission. See Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996) (addressing a case involving alleged discrimination in the treatment of an application and saying, "It would be ironic—bizarre, in fact—if a victim of discrimination were unable to vindicate her rights because she had the peculiar misfortune of being discriminated against in a way that necessarily prevented her from making her prima facie case.").

We are confident the exception applies in Dempsey's case. Marfisi admitted in deposition testimony that Dempsey did not "fail to do anything on his part to seek to get a position with the City of Omaha." Omaha's Chief of Police, the Mayor's Chief of Staff and Deputy Chief of Staff, and the Director of Human Resources knew Dempsey was seeking a job with Omaha. Dempsey filled out the employment form

_____

[6]Regarding qualifications, Police Chief Warren admitted that Dempsey "would have the qualifications to perform just about any job at the Omaha Police Department."

Omaha provided, sent his resume, and followed-up repeatedly. The high-level employees he spoke with expressly led him to believe he had taken adequate steps to apply for employment using the form Omaha provided. Dempsey discussed his prospects repeatedly and received assurances from these personnel, all of whom possessed or appeared to possess sufficient hiring authority to make such assurances. A reasonable jury easily could conclude these repeated assurances more than adequately explain why Dempsey did not take more specific action related to a particular job. In accordance with Green and Chambers, Omaha cannot now avoid suit because Dempsey relied upon those assurances. Because Dempsey was qualified for several open positions filled after his protected speech (as discussed below), and was not hired for those positions, we conclude he has alleged a failure to hire as an adverse action.

### C. Substantial or Motivating Factor / Causation

As discussed in footnote one, the parties raise generally the issue of causation without comment as to the framework that should apply if Dempsey establishes a prima facie case. Towards this end, the parties' arguments blend causation as an issue for the prima facie case with arguments relevant to the final stages of burden-shifting frameworks. Because these issues relate generally to causation, we address them together, as presented by the parties.

To show causation in this context, Dempsey must show his protected speech was "a substantial or motivating factor" in Omaha's failure to hire. Davison v. City of Minneapolis, 490 F.3d 648, 656–57 (8th Cir. 2007). Dempsey argues he has shown causation because Omaha personnel (1) repeatedly assured him they were working diligently to find him a position, (2) repeatedly assured him his prospects were good, and (3) rapidly changed their views towards him following his protected speech. He points to his unique treatment among all Elkhorn employees as the only employee denied a position with Omaha for the purported reason that no position was available. He identifies, as listed above, several police-officer positions that Omaha filled after

-22-

his protected speech. He also cites Marfisi's deposition testimony in which Marfisi stated that, shortly after the protected speech, no one at Omaha was making efforts to place Dempsey. Dempsey notes that Marfisi's statement is contradicted by Thorson's statements to Dempsey at their March 2007 meeting.

In response, Omaha argues it worked diligently to find a position for Dempsey but believed he would not accept an entry-level position. Omaha's argument in this regard does not shield it from Dempsey's claim. In the present context, we may not view the facts in any light other than that favorable to Dempsey, and Dempsey did not tell any of the personnel at Omaha that he would not accept an entry-level position. Rather, he told Police Chief Warren he could not work in a cruiser. Further, the record does not reflect which positions with the Omaha Police Department did and did not require work in a cruiser or were deemed entry-level positions. Also, the various positions Dempsey identifies as having been filled after February 23, as listed above, include different officer rankings. Dempsey is entitled to all reasonable inferences, and the reasonable inference from the different officer rankings is that the rankings are meaningful such that only one of the rankings can be deemed entry level. Accordingly, Dempsey has demonstrated that Omaha filled several non-entry-level officer positions for which he undisputedly was qualified, see supra n.6, after his protected speech.[7]

Regarding the apparent shift in attitudes after the protected speech, we believe timing is meaningful for the analysis of causation in this case. While timing alone often is not convincing evidence of causation, timing carries weight in some contexts especially when accompanied by other evidence. See Davison, 490 F.3d at 656. Here, the Chief of Police told Dempsey it would be "no problem" to find Dempsey a

[7]The dissent suggests that the failure to hire Dempsey may relate to making him a more credible witness in the police officer's litigation. There is nothing in the record suggesting the City of Omaha ever expressed that reason for its failure to hire Dempsey.

job, and the Human Resources Director said he thought Dempsey would receive a job. This evidence strongly suggests attitudes changed rapidly due to an intervening event. Timing is a compelling factor in Dempsey's favor, then, when viewed in the context of Omaha's unique treatment of Dempsey relative to all other Elkhorn employees and when viewed against Omaha's contemporaneous filling of several non-entry-level officer positions.

Viewed in its entirety, we believe the record would permit a reasonable juror to conclude animus based upon Dempsey's comments played a substantial or motivating factor in the decision to deny him employment.

### D. Qualified Immunity

Although we hold summary judgment was improper as to Dempsey's First Amendment Claim, we hold the individual defendants are entitled to qualified immunity. "Qualified immunity shields a government official from liability when his conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In assessing whether rights are "clearly established," we must define the rights at issue with sufficient precision to capture the material circumstances of a case. See Williams v. Jackson, 600 F.3d 1007, 1014 (8th Cir. 2010). Here, unique questions occupy the core of the dispute and the contours of speech control were by no means clearly established in the context of a contested annexation. Without belaboring the point, we simply cannot say that reasonable officials necessarily would have known their actions were prohibited.

### III. Conclusion

We affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.

LOKEN, Circuit Judge, dissenting.

I respectfully dissent for two distinct reasons.

First, the majority commits a cardinal circuit-court sin when it refuses to follow controlling Supreme Court precedent. The Court's opinion in Garcetti v. Ceballos, 547 U.S. 410, 421 (2006), included an explicit holding:

> We *hold* that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from *employer* discipline.

(Emphasis added.) Unwilling to reach the result that holding commands in this case, the majority substantially limits the holding to discipline *by the employee's employer*. This we may not do, which is reason enough to dissent.

Moreover, I see no sound reason to arbitrarily limit Garcetti in this manner.[8] Though the disciplining employer in Garcetti was the plaintiff's employer, as will usually be the case, Garcetti's underlying rationale is equally applicable when a public employee's statements made pursuant to his official duties have "some potential to affect" the operations of another public employer, which then takes action the employee claims is retaliatory. 547 U.S. at 418. The majority concedes that Garcetti should bar a public employee's First Amendment retaliation claim that he was dismissed from a multi-agency task force because he disagreed with or refused to obey an order, even if the agency controlling the task force's personnel decisions was not, for other purposes, the employee's employer. Ante at 12-13. This principle applies

_____

[8]Note that, under the majority's view, Dempsey's speech was protected when Omaha failed to hire him, but under Garcetti, the First Amendment would have provided no protection if Elkhorn had fired him *for the exact same speech*.

-25-

as well when two government entities are on the eve of implementing a consolidation or annexation, and a manager-level employee of the entity being annexed makes statements pursuant to his official duties that the annexing entity considers contrary to its interest in providing the public with uninterrupted government services. As the Court explained, public employers must be afforded "sufficient discretion to manage their operations," including the authority to ensure that employee communications are "accurate, demonstrate sound judgment, and promote the employer's mission." Id. at 422-23. In my view, Garcetti clearly applies to Dempsey's First Amendment claims against the City of Omaha.[9]

Applying Garcetti, Dempsey's speech here at issue was "not protected by the First Amendment if it 'owes its existence' to his professional responsibilities." McGee v. Pub. Water Supply, Dist. # 2, 471 F.3d 918, 921 (8th Cir. 2006), quoting Garcetti,

---

[9]Surprisingly, the majority posits that Garcetti and Pickering v. Bd. of Educ., 391 U.S. 563 (1968), address the same issue, so if one does not apply, neither does the other. Ante at 9-14. This is wrong. Under Pickering, a court first asks whether the public employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no cause of action because, in that circumstance, "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Connick v. Myers, 461 U.S. 138, 146 (1983). Garcetti held that a public employee's speech pursuant to his official duties is not speech as a citizen and is therefore unprotected. But if Garcetti does not apply, *and* if the speech was on a matter of public concern, then a court must apply the Pickering balancing test to determine whether the speech is protected by the First Amendment, including "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Connick, 461 U.S. at 150; see Shands v. City of Kennett, 993 F.2d 1337, 1344-46 (8th Cir. 1993), cert. denied, 510 U.S. 1072 (1994). Were I to reach the question, I would conclude that Dempsey's speech is unprotected under Pickering balancing, which is "a question of law, and thus, is readily susceptible to summary judgment disposition." Bausworth v. Hazelwood Sch. Dist., 986 F.2d 1197, 1198 (8th Cir. 1993) (citation omitted). Footnote 4 and the text preceding that footnote in the majority opinion, ante at 14, are completely at odds with these principles.

-26-

547 U.S. at 421. As the majority concedes, his February 28 statements to Human Resources Director Marfisi are a paradigmatic example of unprotected employee speech under Garcetti. The statements -- telling Marfisi it was "unprofessional," "wrong," and a violation of "due process" to effectively terminate the seven officers before annexation -- were Dempsey's explanation for his refusal to obey a command that he take internal administrative action as Elkhorn Chief of Police. Dempsey testified that his duties included "trying to determine the best way to facilitate [the annexation] process." He admitted that, on February 28, Marfisi "talked to me as though I was an employee" and gave "directives." Without question, the statements were made pursuant to his official duties, owed their existence to his professional responsibilities, and therefore were not insulated from employer discipline by the First Amendment. See Kozisek v. County of Seward, 539 F.3d 930, 937 (8th Cir. 2008); Bradley v. James, 479 F.3d 536, 538 (8th Cir. 2007); McGee, 471 F.3d at 921.

Dempsey's earlier public statements to *Omaha World Herald* reporters raise a somewhat different question. In Garcetti, the Court gave as an example of public employee statements that are outside the course of official duties and therefore eligible for First Amendment protection, "writing a letter to a local newspaper." 547 U.S. at 423. However, statements to the press will be pursuant to official duties under Garcetti when, for example, a department head speaks to the press about matters involving his department "as the public face of the Department," or "when a government employee answers a reporter's questions involving matters relating to his employment [in] circumstances in which the employee's answers will take on the character of '[o]fficial communications.'" Foley v. Town of Randolph, 598 F.3d 1, 7-8 (1st Cir. 2010), quoting Garcetti, 547 U.S. at 422; see Tamayo v. Blagojevich, 526 F.3d 1074, 1091-92 (7th Cir. 2008); Nixon v. City of Houston, 511 F.3d 494, 498-99 (5th Cir. 2007), cert. denied, 553 U.S. 1065 (2008).

Here, Dempsey did not contact the press as a citizen to publicly criticize Omaha's hiring process, as the teacher did in Pickering, the example cited in Garcetti. Rather, he testified that he responded to reporters' inquiries. "I made the

statements . . . because I was asked the question. And I assume I was asked the question because I was Chief of Police." The questions involved a matter internal to a publicly contested annexation process. Managerial comment about the internal dispute was certain to be newsworthy, a situation in which "[e]mployers have heightened interests in controlling speech [to] ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." Garcetti, 547 U.S. at 422-23. In these circumstances, our decision applying Garcetti in Bonn v. City of Omaha, 623 F.3d 587, 593 (8th Cir. 2010), should be controlling on this panel:

> Bonn has no claim against the appellees based on their reactions to her comments to the media, because she was not speaking as a citizen when she made those remarks. Bonn spoke to the media pursuant to her official duties as the Public Safety Auditor. She acted in response to media inquiries . . . and the media identified her as a public official rather than a private citizen. Bonn explained . . . that throughout her employment, she often spoke with the media "to . . . increase public confidence . . . and promote public awareness." It is thus clear from Bonn's own averments that her job duties included speaking to the media about her work . . . and that her comments to the media . . . were made in her official capacity.

Second, I dissent from the majority's superficial analysis of the adverse employment action question. The opinion simply asserts there is "no meaningful distinction between Dempsey seeking employment with Omaha and the plaintiff in Perry [v. Sinderman, 408 U.S. 593 (1972),] seeking employment for the start of a new school year." Ante at 20. But this ignores the Supreme Court's caution "that expression related to academic scholarship or classroom instruction [may] implicate additional constitutional interests that are not fully accounted for by this Court's

-28-

customary employee-speech jurisprudence." Garcetti, 547 U.S. at 425; see Keyishian v. Board of Regents, 385 U.S. 589, 603 (1967).[10]

This case, by contrast, involves a run-of-the-mine decision not to hire an applicant for public employment. Rather than accommodate the interests of public agencies in hiring competent, effective staff, the majority provides a roadmap for the wholesale transfer of public-sector hiring decisions from agency officials to the First Amendment courtroom -- a prospective worker need only apply for a public job, call a press conference and declare the agency to be rife with incompetence and mismanagement that he intends to redress, and then sue when he does not get the job, claiming the refusal to hire was based upon protected speech. This case is a less extreme illustration of the problem. When Dempsey made his comments to the media, the seven Elkhorn police officers not being hired had hired an attorney. Litigation was imminent. Dempsey's public comments, criticizing Omaha from his vantage point as the plaintiffs' supervising officer, made him a valuable witness for Omaha's litigation adversaries. Must Omaha hire Dempsey, at the supervisory level his experience otherwise warranted,[11] and thereby give him heightened credibility that would adversely affect the City in litigation and lead to internal disruption and controversy? Even if Dempsey's speech was protected from employer discipline, the protection should not insulate him from a refusal to hire.

---

[10]The majority also relies on Rutan v. Repub. Party of Ill., 497 U.S. 62 (1990), for its conclusion that the First Amendment routinely applies to failure-to-hire claims. In Rutan, the Court dealt with the unique First Amendment issues raised by a series of political patronage cases.

[11]Omaha adopted the policy that it would only offer qualified Elkhorn police officers entry-level positions in the Omaha Police Department, primarily to avoid collective bargaining strife with the union representing Omaha police officers. Dempsey advised that his age (62) and health would preclude "work in a cruiser car," but he would like to work for Omaha at a comparable pay level ($75,000 per year) for two or three more years.

In my view, it is particularly unfortunate, and more than a little ironic, that the majority decrees an unprecedented expansion of judicial oversight of public-sector hiring at a time when the nation's voters are demanding greater accountability from the elected officials who supervise and manage government employees. The majority's decision presumably applies to the hiring of legislative aides as well as police-department executives. I strongly dissent from this excessive judicial interference with the operation of the political branches. I would affirm on the ground that the speech on which Dempsey's claim is based was not insulated from employer discipline by the First Amendment because it was made pursuant to his official duties as a public employee within the meaning of <u>Garcetti</u>, 547 U.S. at 421.

———————————————————