# United States Court of Appeals

## For the First Circuit

No. 09-1558

CHIEF CHARLES D. FOLEY, JR.,

Plaintiff, Appellant,

v.

TOWN OF RANDOLPH, MASSACHUSETTS;
RICHARD W. WELLS, PAUL J. CONNORS, WILLIAM ALEXOPOULOS IN THEIR
OFFICIAL CAPACITIES; MAUREEN C. KENNY AND JAMES BURGESS IN THEIR
INDIVIDUAL AND OFFICIAL CAPACITIES,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl, Circuit Judge,
and DiClerico,[*] District Judge.

Kevin G. Powers with whom Linda Evans and Rodgers, Powers &
Schwartz LLP were on brief for appellant.
John Foskett with whom Paul R. DeRensis and Deutsch, Williams,
Brooks, Derensis & Holland, P.C., were on brief for appellees.

March 10, 2010

[*]Of the District of New Hampshire, sitting by designation.

**STAHL**, **Circuit Judge**.  Plaintiff-appellant Charles D. Foley, Jr. ("Foley"), Chief of the Fire Department in Randolph, Massachusetts, claims that the Town of Randolph and the Town selectmen ("Defendants") wrongfully retaliated against him in violation of his First Amendment rights when they suspended him for fifteen days based on public statements that he made at the scene of a fatal fire.  Plaintiff brought suit pursuant to 42 U.S.C. § 1983, and the district court granted summary judgment in favor of Defendants.  Plaintiff now appeals, and after a careful review, we affirm.

## I. Facts and Background

The following facts are undisputed, except where stated. On May 17, 2007, at approximately 5:00 a.m., the Randolph Fire Department ("Department") responded to a fire at a single-family residence in Randolph.  When Foley arrived at the scene, he took command as Chief of the Fire Department.  Tragically, two children, ages seventeen and ten, were trapped in a second floor bedroom and died.  At the scene of the fatal fire, the State Fire Marshal, Foley, and Sergeant Frank McGinn, an employee of the State Fire Marshal's office and the lead investigator that day, answered questions from the media at press conferences convened by the Marshal.[1]  Foley was in uniform and fire suppression activities

_____

[1]According to Foley, there were three press conferences at the scene, all of which were facilitated by the Marshal.  Foley also recalled in his deposition that Deputy Marshal Leonard, the State

-2-

were still ongoing when he spoke, though Foley asserts that, by the time of the first press conference, the fire was under control and he had stepped away from command, leaving the deputy chief in charge.  At that first press conference, the Marshal spoke, and then Foley addressed the reporters.

Foley spoke about the details of the fire, but he also commented on what he considered to be inadequate funding and a related lack of staffing at the Randolph Fire Department.[2]  Foley noted that the Department had lost positions each year since 2002 and that the Department's response times had increased over the same period.  While Foley could not definitively state that the outcome in this particular fire would have been different if the Department had been better staffed, he indicated that the operation would have gone more professionally and more according to standard if the Department had more manpower.

Foley then declined to answer questions from the press which related to the ongoing investigation of the fire, for example, whether there were any working smoke detectors inside the

Fire Marshal's second-in-command, was present at the press conferences, but Foley said that he did not believe that Leonard made a statement.

[2]Foley characterizes his role at the press conferences as "talking about the fire" and answering questions from the press. However, it is unclear from the partial transcript of the first press conference whether Foley's comments about the understaffing and underfunding of the Department were prompted by a question from the press or were made on Foley's own initiative.

-3-

house and where in the house the fire started.  Subsequently, in response to questions from reporters, he again spoke of his frustration that the staffing levels of the Department were inadequate to accomplish the Department's goals.  He referred specifically to Proposition 2 ½, Mass. Gen. Laws ch. 59, § 21C, the Massachusetts statute which limits property tax increases by municipalities, and lamented that the proposed overrides to Proposition 2 ½ had been defeated in the Town of Randolph for two years in a row.  He said, "I've been asking to replace the fire fighters here in the Town over the last five years and it seems to have fallen on deaf ears."  He then said to the reporters, "As many of you are here today you have the resources to bring this information to the public."

Also, at the scene of the fire, Foley objected to the reduction in the number of firefighters in the Department to Defendant James F. Burgess, Jr., a Randolph Selectman.  Burgess asserted in his affidavit that during this exchange, Foley grabbed the draft of a reporter's newspaper article and "shoved [it] forcefully" into Burgess's chest.  Foley disputes this allegation, asserting that he "passed the draft to Burgess."  Foley also spoke with Defendant Maureen C. Kenney, a Selectwoman of Randolph, at the scene and made reference to the manpower cuts in the Department.

Later that day, Foley called Kenney at her home, and Kenney criticized him for addressing staffing and budgetary issues

-4-

at the scene of the fire, rather than focusing on the victims or the heroism of the firefighters.

Subsequent to these events, disciplinary charges were brought against Foley.[3] It was alleged that Foley's statements to the media at the scene of the fire "demonstrated a lack of sound judgment and of accuracy" and "were not conducive to the Town's mission of providing effective fire protection services"; that Foley had "initiated inappropriate physical contact" with Burgess; and that Foley "displayed a lack of the demeanor, ability, and independent judgment required for competent command and control" while interacting with Kenney at the scene.

The Town appointed a hearing officer to evaluate the allegations and determine whether there was cause to discipline Foley. The hearing officer considered testimony and exhibits during a three-day hearing, and on August 27, 2007, issued a report finding that Foley did "initiate inappropriate and unprovoked physical contact" with Burgess and that he made "inappropriate, inaccurate, intemperate, and misleading statements to the news media" at the scene of the May 17, 2007, fire.[4] The hearing

---

[3]Though Foley asserts that it was Burgess and Kenney who brought the charges against him, the record does not reveal the origin of the allegations.

[4]Regarding the third allegation, the hearing officer concluded that while Foley was, in fact, "emotional" at the scene, "his exhibition of emotions did not impair him from being in command or in tactical control of the fire scene nor was such behavior inappropriate or irregular under those circumstances."

-5-

officer recommended that Foley be suspended without compensation for fifteen workdays. On September 10, 2007, the Board of Selectmen voted three-to-two to adopt the hearing officer's recommendation, and Foley was suspended for fifteen consecutive workdays without compensation, commencing on September 17, 2007.

Neither the contract which governed Foley's employment from 2003 to 2006 nor the "strong" chief statute, Mass. Gen. Laws ch. 48, § 42, which governed his employment subsequent to October 31, 2006, specifically authorized or required Foley to make public statements on matters affecting the Fire Department as part of his official duties as Chief. However, nothing in the contract or the statute prohibited Foley from doing so.[5]

Previously, in August 2006, Foley received a written performance evaluation from the Town, which scored his job performance in seven categories, including "Public & Community Relations/Communication." The description of that category included: "[i]nteracts well with the media." In an affidavit, Foley stated that his communications with the media were made of

---

[5]In 2006, when Foley and the Board of Selectmen were engaged in contract negotiations, Foley proposed a provision that specifically granted him, as Fire Chief, the authority to make public statements on "any matters which may affect the public as they may apply to public safety . . . or the fire department generally." That provision and the majority of the other provisions proposed by Foley were rejected by the Board. Because Foley and the Town were unable to agree on a negotiated contract, the Board reappointed Foley under the provisions of Mass. Gen. Laws ch. 48, § 42.

his "own volition" but that he was expected by Town officials and residents to "interact well" with the media on those occasions when he chose to do so.

Prior to the incident at issue in this case, Foley had conducted at least one other press conference, answered media inquiries, and offered comment to the media regarding the business of the Department and the Department's activities. Richard Wells, Foley's immediate predecessor in the Fire Chief position, also routinely responded to inquiries from the media regarding the Fire Department during his tenure.

Foley filed this action in the United States District Court for the District of Massachusetts, on November 30, 2007, alleging a violation of his First Amendment rights and several state law claims. Both parties filed motions for summary judgment, and after a hearing and a review of the submissions, the district court granted the Defendants' motion as to Foley's First Amendment claim in a Memorandum and Order dated March 11, 2009. It is from that order that Foley now appeals.[6]

## II. Discussion

A. Standard of Review

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to Foley

---

[6]The district court dismissed Foley's state law claims without prejudice, and Foley has limited his appeal to his First Amendment claim.

and drawing all reasonable inferences in his favor. <u>Schubert</u> v. <u>City of Springfield</u>, 589 F.3d 496, 500 (1st Cir. 2009). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

B. Foley's First Amendment Claim

Foley argues that his speech to the media at the scene of the fire on May 17, 2007, was protected by the First Amendment and that by disciplining him on account of that speech, the Defendants have violated the Constitution. Given the circumstances surrounding the speech in this case, we disagree.

The Supreme Court has long recognized that public employees do not forego all the protections of the First Amendment by virtue of working for the government. <u>See</u> <u>Pickering</u> v. <u>Bd. of Educ.</u>, 391 U.S. 563, 568 (1968). The Court's employee-speech jurisprudence has protected the rights not only of the employees themselves, but of the general public "in receiving the well-informed views of government employees engaging in civic discussion." <u>Garcetti</u> v. <u>Ceballos</u>, 547 U.S. 410, 419 (2006). Against these interests, the Court has sought to balance the interests of government employers in exercising some degree of control over their employees' words and actions in order to ensure

the efficient provision of public services.  Id. at 418-19.  The Court has held that "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  Id. at 419.

In other words, to determine whether Foley's speech is entitled to First Amendment protection, the first question we must answer is whether Foley was both (1) speaking about a matter of public concern and (2) speaking as a citizen.[7]  If the answer to either of these sub-parts is no, then he has no First Amendment claim based on the Defendants' action in relation to his speech. Garcetti, 547 U.S. at 418.  It is only if we determine that Foley was speaking as a citizen about a matter of public concern that "the possibility of a First Amendment claim arises, and the second step of the inquiry is made: 'The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'"  Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007)(quoting Garcetti, 547 U.S. at 418).

Here, Foley was obviously speaking about a matter of public concern.  The budget and effectiveness of a town's fire

---

[7]Though Foley argues otherwise, we have previously held that this is a question of law for the court when, as here, the material facts are not in dispute.  Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007); accord Gagliardi v. Sullivan, 513 F.3d 301, 306 n.8 (1st Cir. 2008).

department is certainly of concern to the public, especially when that budget may be impacted by voter approval of an increase to the town's property tax burden. As Chief of the Fire Department, Foley's opinion on the effect of diminished resources on the Department's ability to fight fires is an example of the "well-informed views" which the public has an interest in receiving.

At issue, then, is whether Foley was speaking as a citizen when he made his remarks to the press about underfunding and understaffing. In Garcetti, the Court held that when public employees make statements "pursuant to their official duties," they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline. 547 U.S. at 421. This is so because "[e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity." Id. at 422. But the Court acknowledged that the case afforded it "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate" since the plaintiff, Ceballos, had conceded his speech was pursuant to his employment duties.[8] Id. at 424.

---

[8]Ceballos, a deputy district attorney, had prepared an internal memorandum for his supervisors expressing his belief that an affidavit used to obtain a critical search warrant in a case contained serious misrepresentations and recommending dismissal of the case. Garcetti, 547 U.S. at 413-14. Ceballos claimed that the memorandum was protected speech.

The Court did provide some guidance, however, indicating that the scope of an employee's duties for First Amendment purposes may not necessarily be determined by the employee's formal job description, as "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." Garcetti, 547 U.S. at 424-25. Further, it was not dispositive that Ceballos "expressed his views inside his office, rather than publicly" or that the speech in question "concerned the subject matter of [his] employment." Id. at 420-21. Ultimately, "[t]he proper inquiry is a practical one." Id. at 424.

In dicta, the Court stated that an employee's speech retains some possibility of First Amendment protection when it is "the kind of activity engaged in by citizens who do not work for the government." Garcetti, 547 U.S. at 423. The Court cited two examples of such activity: (1) writing a letter to a local newspaper, as the teacher-plaintiff did in Pickering to criticize the school board, see 391 U.S. at 566, and (2) discussing politics with a co-worker, see Rankin v. McPherson, 483 U.S. 378 (1987), and equated them to "public statements [made] outside the course of performing [one's] official duties." Garcetti, 547 U.S. at 423. The Court distinguished those examples from speech made pursuant to employment responsibilities, for which "there is no relevant analogue to speech by citizens who are not government employees." Id. at 424. Ceballos's speech had no such analogue; when he wrote

-11-

the internal memorandum at issue in the case, he "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case."  Id. at 421 (emphasis added).

In analyzing whether Foley spoke as a citizen rather than as the Chief of the Fire Department, we first note that it is not dispositive that Foley was not required to speak to the media.  See Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192, 1203 (10th Cir. 2007) ("speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform"); Williams v. Dallas Ind. Sch. Dist., 480 F.3d 689, 693 (5th Cir. 2007) ("[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties" even if the speech at issue "is not necessarily required by [the employee's] job duties").  Foley's job description is "neither necessary nor sufficient" to determine whether his speech at the press conference was pursuant to his official duties, Garcetti, 547 U.S. at 425, though we do note that the fact that Foley was ostensibly evaluated on whether he "[i]nteracts well with the media" suggests that speaking to the press is a duty he "actually [was] expected to perform."  Id. at 424-25.

More critical to our analysis is the context of Foley's speech.  Though Foley was not required to speak to the press as

-12-

part of his job, he did, in fact, choose to do so at a press conference convened by the State Fire Marshal, at the scene of a fatal fire, at which no one but the Marshal, the Marshal's lead investigator, and Foley himself gave comment. Foley was in uniform and on duty at the time.[9] While he declined to answer certain questions posed by reporters, he voluntarily spoke about issues related to the budget and staffing of the Department. As Chief, he had been in command of the scene, and when choosing to speak to the press, he would naturally be regarded as the public face of the Department when speaking about matters involving the Department.[10] Under these circumstances, Foley addressed the media in his official capacity, as Chief of the Fire Department, at a forum to which he had access because of his position. Thus, "there is no relevant analogue to speech by citizens." Garcetti, 547 U.S. at 424; see Brammer-Hoelter, 492 F.3d at 1203 (equating speaking as a

_____

[9]While neither of these factors is dispositive, each is relevant and important to the inquiry. See, e.g., Nixon v. City of Houston, 511 F.3d 494, 498 (5th Cir. 2007) (noting that police officer spoke to the media while on duty, in uniform, and while working at the scene of an accident, and holding that speech was not protected); Mills v. City of Evansville, 452 F.3d 646, 648 (7th Cir. 2006) (observing that police officer was on duty and in uniform when engaged in challenged speech, and concluding that she spoke "in her capacity as a public employee").

[10]Cf. Tabb v. District of Columbia, 605 F. Supp. 2d 89, 95 (D.D.C. 2009) ("If plaintiff was generally responsible for presenting the public face of the agency to the District of Columbia government and to the media, and if she expressly spoke in that capacity when she contacted the Mayor's Office and media outlets . . ., then . . . [her] statements likely are not protected.").

-13-

government employee with speaking "as an individual acting 'in his or her professional capacity'" (quoting Garcetti, 547 U.S. at 422)); cf. Tamayo v. Blagojevich, 526 F.3d 1074, 1092 (7th Cir. 2008) (holding that a senior administrator of an agency was not speaking as a citizen when testifying before a legislative committee since she was testifying "because of the position she held within the agency" and was "not appearing as 'Jane Q. Public'").

We note that Foley's speech is distinguishable from the letter to the editor written by the plaintiff in Pickering. As the Court noted in Garcetti, that letter had "no official significance and bore similarities to letters submitted by numerous citizens every day." Garcetti, 547 U.S. at 422. Here, given that Foley spoke from the scene of the fire where he was on duty, in uniform, and speaking alongside the State Fire Marshal, we cannot say that the speech had "no official significance." In fact, it is more likely that anyone who observed the speech took it to bear the imprimatur of the Fire Department.

Certainly, Foley's comments to the press fall closer to the line of citizen speech than the internal memorandum that Ceballos submitted to his supervisor in Garcetti. However, the fact that Foley expressed his views to the public rather than within the workplace is not dispositive, and other courts have found employee speech to fall outside the protection of the First

-14-

Amendment even when it is delivered publicly. See, e.g., Nixon, 511 F.3d at 498; Turner v. Clark County Sch. Dist., No. 2:07-CV-00101-JCM-GWF, 2009 WL 736016, at *2 (D. Nev. Mar. 19, 2009).

Foley argues that his speech is nonetheless analogous to that of citizens "who avail themselves of opportunities to publicly express themselves through the media." Foley points specifically to a Boston Globe article in which Randolph residents expressed their opinions on the budgetary and staffing issues of the Fire Department as they related to the May 17, 2007, fire. Foley also cites an article from the Patriot Ledger in which Randolph residents spoke to a reporter regarding their votes on the Proposition 2 ½ override of 2008. However, this speech is not analogous to Foley's. Any citizen can be interviewed by a reporter about her reaction to an event or her thoughts about an issue. But when a government employee answers a reporter's questions involving matters relating to his employment, there will be circumstances in which the employee's answers will take on the character of "[o]fficial communications," Garcetti, 547 U.S. at 422, and thus will not be entitled to First Amendment protection. Those circumstances were present here: Foley spoke while in uniform and on duty; he spoke from the scene of a fire where he had been in command as the Chief of the Fire Department; and his comments were bookended by those of another official -- the State Fire Marshal. When Foley availed himself of this particular opportunity to

-15-

communicate with Town residents through the media on matters involving his Department, his speech took on a degree of official significance that has "no relevant analogue to speech by citizens." Garcetti, 547 U.S. at 424.

Foley also contends that the content of his speech at the press conference entitles that speech to First Amendment protection. He argues that once he stopped speaking about the fire and began to "lecture" the Town residents about their defeat of the Proposition 2 ½ overrides, he was speaking as a citizen. We disagree. Foley characterizes the nature of his comments about Proposition 2 ½ too narrowly. His remarks on Proposition 2 ½ related to his concerns about its impact on the budget and staffing needs of the Fire Department. The general topic of Foley's remarks was the struggle of the Fire Department to accomplish its goals in the absence of additional funding and staffing that an override of Proposition 2 ½ could provide. The subject of Foley's speech was entirely related to matters concerning the Fire Department.[11] Under

---

[11]Lindsey v. City of Orrick, 491 F.3d 892 (8th Cir. 2007), which Foley cites for the proposition that an employee speaks as a citizen when his speech deviates from a subject related to his job duties, is distinguishable. In Lindsey, the city public works director, whose duties included maintaining the city's parks, water systems, streets, and sewers, spoke at several City Council meetings about what he believed to be the city's noncompliance with the state's "sunshine" law. 491 F.3d at 895-96. Lindsey questioned whether the city was violating the law by entering into non-public executive sessions and passing city ordinances without public discussion. Id. at 896. Though Lindsey's job required him to attend Council meetings to report about public works issues, id. at 895, his comments about the city's alleged noncompliance with

the circumstances of the press conference, when speaking about such matters, Foley was speaking in his official capacity as Chief.

Our holding does not, as Foley claims, strip him of the opportunity ever to speak publicly on similar issues, without fear of retaliatory discipline. As Chief, Foley is on call at all hours, but that does not mean that <u>any</u> public statements he makes regarding the Fire Department will be outside the protection of the First Amendment. As the Supreme Court has recognized, "[w]ere [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues." <u>Garcetti</u>, 547 U.S. at 420 (citing <u>San Diego</u> v. <u>Roe</u>, 543 U.S. 77, 82 (2004)) (second and third alterations in <u>Garcetti</u>). As Fire Chief, Foley is "'the member[] of [the] community most likely to have informed and definite opinions'" about the budget and staffing of the Fire Department, <u>see</u> <u>Garcetti</u>, 547 U.S. at 419 (quoting <u>Pickering</u>, 391 U.S. at 572), but he is also the individual whose speech is most likely to be construed as an "[o]fficial communication" of the Department. Thus, determining whether a government employee who is the head and de facto spokesperson of his department is speaking as a citizen or an employee is a highly fact-specific inquiry.

We emphasize that our holding is limited to the particular facts of this case. Under the circumstances of the

---

the sunshine law were in no way related to public works.

press conference discussed above, there could be no doubt that Foley was speaking in his official capacity and not as a citizen. However, as the district court noted, had Foley voiced his concerns and frustrations in another forum -- at a town meeting, in a letter to the editor, or even in a statement to the media at a different time and/or place -- we might characterize his speech differently. See, e.g., McLaughlin v. City of Nashville, Civil No. 06-4069, 2006 U.S. Dist. LEXIS 78133, at *8-9 (W.D. Ark. Oct. 23, 2006) (holding that city finance director stated a claim that she spoke "in her capacity as a concerned citizen, rather than in her official capacity" when she spoke about the financial situation of the city, via newspaper and radio, "at her own expense and on her own time"); Hailey v. City of Camden, Civil No. 01-3967, 2006 WL 1875402, at *16 (D.N.J. July 5, 2006) (holding that deputy fire chiefs who attended City Council meeting and complained about fire department practices after "plac[ing] their names on the agenda as any citizen would" were not speaking pursuant to their official duties).

C. Conclusion

We recognize that there is a delicate balance that must be struck between the constitutional rights of government employees to express their views on matters related to their employment and the public's interest in hearing those views, on the one hand, and the interest of a government employer in controlling employee speech that contravenes the employer's goals, on the other. We

hold that when the circumstances surrounding a government employee's speech indicate that the employee is speaking in his official capacity, Garcetti dictates that we strike the balance in favor of the government employer. Under such circumstances, the employee's speech takes on an official significance and, as the Supreme Court has reasoned, "[o]fficial communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." Garcetti, 547 U.S. at 422-23. Here, under circumstances which indicate that Foley was speaking as Chief, members of the Board did not violate Foley's free speech right when they concluded that it was inappropriate for Foley to address budgetary and staffing issues at the scene of a fatal fire.

Speaking to the media under the circumstances discussed above, Foley could have hoped and anticipated that his frustration with the budgetary and staffing shortfalls of the Department might have reached a greater audience and had a greater impact than if he voiced his views in another forum. However, those same circumstances imbued his speech with the official significance that removed it from the protection of the First Amendment.

We conclude that Foley was not speaking as a citizen and that he consequently has no First Amendment cause of action.[12] We thus _affirm_ the order of the district court granting summary judgment in favor of the Defendants.

---

[12]We acknowledge that in Brasslett v. Cota, 761 F.2d 827 (1st Cir. 1985), we reached a different outcome on a somewhat similar set of facts. However, that case was decided before Garcetti, which now governs our review of the issues.