LOKEN, Circuit Judge,
dissenting.
I respectfully dissent for two distinct reasons.
First, the majority commits a cardinal circuit-court sin when it refuses to follow controlling Supreme Court precedent. The Court’s opinion in Garcetti v. Ceballos, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), included an explicit holding:
We hold that when public employees make statements pursuant to their official duties, the employees are not speak *655 ing as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.
(Emphasis added.) Unwilling to reach the result that holding commands in this case, the majority substantially limits the holding to discipline by the employee’s employer. This we may not do, which is reason enough to dissent.
Moreover, I see no sound reason to arbitrarily limit Garcetti in this manner.[8] Though the disciplining employer in Garcetti was the plaintiffs employer, as will usually be the case, Garcetti’s underlying rationale is equally applicable when a public employee’s statements made pursuant to his official duties have “some potential to affect” the operations of another public employer, which then takes action the employee claims is retaliatory. 547 U.S. at 418, 126 S.Ct. 1951. The majority concedes that Garcetti should bar a public employee’s First Amendment retaliation claim that he was dismissed from a multiagency task force because he disagreed ■with or refused to obey an order, even if the agency controlling the task force’s personnel decisions was not, for other purposes, the employee’s employer. Ante at 647-48. This principle applies as well when two government entities are on the eve of implementing a consolidation or annexation, and a manager-level employee of the entity being annexed makes statements pursuant to his official duties that the annexing entity considers contrary to its interest in providing the public with uninterrupted government services. As the Court explained, public employers must be afforded “sufficient discretion to manage their operations,” including the authority to ensure that employee communications are “accurate, demonstrate sound judgment, and promote the employer’s mission.” Id. at 422-23, 126 S.Ct. 1951. In my view, Garcetti clearly applies to Dempsey’s First Amendment claims against the City of Omaha.[9]
Applying Garcetti Dempsey’s speech here at issue was “not protected by the First Amendment if it ‘owes its existence’ *656 to his professional responsibilities.” McGee v. Pub. Water Supply, Dist. #2, 471 F.3d 918, 921 (8th Cir.2006), quoting Garcetti 547 U.S. at 421, 126 S.Ct. 1951. As the majority concedes, his February 28 statements to Human Resources Director Marfisi are a paradigmatic example of unprotected employee speech under Garcetti. The statements — telling Marfisi it was “unprofessional,” “wrong,” and a violation of “due process” to effectively terminate the seven officers before annexation — were Dempsey’s explanation for his refusal to obey a command that he take internal administrative action as Elkhorn Chief of Police. Dempsey testified that his duties included “trying to determine the best way to facilitate [the annexation] process.” He admitted that, on February 28, Marfisi “talked to me as though I was an employee” and gave “directives.” Without question, the statements were made pursuant to his official duties, owed their existence to his professional responsibilities, and therefore were not insulated from employer discipline by the First Amendment. See Kozisek v. County of Seward, 539 F.3d 930, 937 (8th Cir.2008); Bradley v. James, 479 F.3d 536, 538 (8th Cir.2007); McGee, 471 F.3d at 921.
Dempsey’s earlier public statements to Omaha World Herald reporters raise a somewhat different question. In Garcetti, the Court gave as an example of public employee statements that are outside the course of official duties and therefore eligible for First Amendment protection, “writing a letter to a local newspaper.” 547 U.S. at 423, 126 S.Ct. 1951. However, statements to the press will be pursuant to official duties under Garcetti when, for example, a department head speaks to the press about matters involving his department “as the public face of the Department,” or “when a government employee answers a reporter’s questions involving matters relating to his employment [in] circumstances in which the employee’s answers will take on the character of ‘[o]fficial communications.’” Foley v. Town of Randolph, 598 F.3d 1, 7-8 (1st Cir.2010), quoting Garcetti 547 U.S. at 422, 126 S.Ct. 1951; see Tamayo v. Blagojevich, 526 F.3d 1074, 1091-92 (7th Cir.2008); Nixon v. City of Houston, 511 F.3d 494, 498-99 (5th Cir.2007), cert. denied, 553 U.S. 1065, 128 S.Ct. 2504, 171 L.Ed.2d 787 (2008).
Here, Dempsey did not contact the press as a citizen to publicly criticize Omaha’s hiring process, as the teacher did in Pickering, the example cited in Garcetti. Rather, he testified that he responded to reporters’ inquiries. “I made the statements ... because I was asked the question. And I assume I was asked the question because I was Chief of Police.” The questions involved a matter internal to a publicly contested annexation process. Managerial comment about the internal dispute was certain to be newsworthy, a situation in which “[e]mployers have heightened interests in controlling speech [to], ensure that their employees’ official communications are accurate, demonstrate sound judgment, and promote the employer’s mission.” Garcetti, 547 U.S. at 422-23, 126 S.Ct. 1951. In these circumstances, our decision applying Garcetti in Bonn v. City of Omaha, 623 F.3d 587, 593 (8th Cir.2010), should be controlling on this panel:
Bonn has no claim against the appellees based on their reactions to her comments to the media, because she was not speaking as a citizen when she made those remarks. Bonn spoke to the media pursuant to her official duties as the Public Safety Auditor. She acted in response to media inquiries ... and the media identified her as a public official rather than a private citizen. Bonn explained ... that throughout her employment, she often spoke with the media “to *657 ... increase public confidence ... and promote public awareness.” It is thus clear from Bonn’s own averments that her job duties included speaking to the media about her work ... and that her comments to the media ... were made in her official capacity.
Second, I dissent from the majority’s superficial analysis of the adverse employment action question. The opinion simply asserts there is “no meaningful distinction between Dempsey seeking employment ■with Omaha and the plaintiff in Perry [v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972),] seeking employment for the start of a new school year.” Ante at 652. But this ignores the Supreme Court’s caution “that expression related to academic scholarship or classroom instruction [may] implicate additional constitutional interests that are not fully accounted for by this Court’s customary employee-speech jurisprudence.” Garcetti, 547 U.S. at 425, 126 S.Ct. 1951; see Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).[10]
This case, by contrast, involves a run-of-the-mine decision not to hire an applicant for public employment. Rather than accommodate the interests of public agencies in hiring competent, effective staff, the majority provides a roadmap for the wholesale transfer of public-sector hiring decisions from agency officials to the First Amendment courtroom — a prospective worker need only apply for a public job, call a press conference and declare the agency to be rife with incompetence and mismanagement that he intends to redress, and then sue when he does not get the job, claiming the refusal to hire was based upon protected speech. This case is a less extreme illustration of the problem. When Dempsey made his comments to the media, the seven Elkhorn police officers not being hired had hired an attorney. Litigation was imminent. Dempsey’s public comments, criticizing Omaha from his vantage point as the plaintiffs’ supervising officer, made him a valuable witness for Omaha’s litigation adversaries. Must Omaha hire Dempsey, at the supervisory level his experience otherwise warranted,[11] and thereby give him heightened credibility that would adversely affect the City in litigation and lead to internal disruption and controversy? Even if Dempsey’s speech was protected from employer discipline, the protection should not insulate him from a refusal to hire.
In my view, it is particularly unfortunate, and more than a little ironic, that the majority decrees an unprecedented expansion of judicial oversight of public-sector hiring at a time when the nation’s voters are demanding greater accountability from the elected officials who supervise and manage government employees. The majority’s decision presumably applies to the hiring of legislative aides as well as police-department executives. I strongly dissent from this excessive judicial interference with the operation of the political branches. I would affirm on the ground that the speech on which Dempsey’s claim is based *658 was not insulated from employer discipline by the First Amendment because it was made pursuant to his official duties as a public employee within the meaning of Garcetti 547 U.S. at 421, 126 S.Ct. 1951.

. Note that, under the majority’s view, Dempsey’s speech was protected when Omaha failed to hire him, but under Garcetti, the First Amendment would have provided no protection if Elkhorn had fired him for the exact same speech.

. Surprisingly, the majority posits that Garcetti and Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), address the same issue, so if one does not apply, neither does the other. Ante at 645-48. This is wrong. Under Pickering, a court first asks whether the public employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no cause of action because, in that circumstance, “government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.” Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Garcetti held that a public employee's speech pursuant to his official duties is not speech as a citizen and is therefore unprotected. But if Garcetti does not apply, and if the speech was on a matter of public concern, then a court must apply the Pickering balancing test to determine whether the speech is protected by the First Amendment, including "full consideration of the government’s interest in the effective and efficient fulfillment of its responsibilities to the public.” Connick, 461 U.S. at 150, 103 S.Ct. 1684; see Shands v. City of Kennett, 993 F.2d 1337, 1344-46 (8th Cir.1993), cert. denied, 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994). Were I to reach the question, I would conclude that Dempsey's speech is unprotected under Pickering balancing, which is "a question of law, and thus, is readily susceptible to summary judgment disposition.” Bausworth v. Hazelwood Sch. Dist., 986 F.2d 1197, 1198 (8th Cir.1993) (citation omitted). Footnote 4 and the text preceding that footnote in the majority opinion, ante at 648, are completely at odds with these principles.

. The majority also relies on Rutan v. Repub. Party of Ill., 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), for its conclusion that the First Amendment routinely applies to failure-to-hire claims. In Rutan, the Court dealt with the unique First Amendment issues raised by a series of political patronage cases.

. Omaha adopted the policy that it would only offer qualified Elkhorn police officers entry-level positions in the Omaha Police Department, primarily to avoid collective bargaining strife with the union representing Omaha police officers. Dempsey advised that his age (62) and health would preclude "work in a cruiser car,” but he would like to work for Omaha at a comparable pay level ($75,000 per year) for two or three more years.