O’SCANNLAIN, Circuit Judge,
with whom
KOZINSKI, Chief Judge, joins, concurring only in the judgment:
Seven years ago, the Supreme Court counseled us that we had “miseonceive[d] the theoretical underpinnings” of First Amendment retaliation law. Garcetti v. Ceballos, 547 U.S. 410, 423, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). I respectfully dissent from the majority’s analysis because our court makes the same error today by rejecting what California law tells us about the professional duties of that state’s police officers. Furthermore, I fear that today’s new approach will lead to “judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers.” Id. Federal courts have no business managing the daily activities of police departments.
I
We reheard this case en banc to consider whether Huppert v. City of Pittsburg, 574 F.3d 696 (9th Cir.2009), should remain good law. That case called on us to apply Garcetti’s holding that “when public employees make statements pursuant to their official duties, the. employees are not speaking as citizens for First Amendment purposes” to a lawsuit brought by a California police officer. 547 U.S. at 421, 126 S.Ct. 1951. We determined that the duty of California law enforcement officers to report criminal activity meant that the officer’s reports of police misconduct internally, as well as to the FBI, did not qualify as *1084 protected “citizen-speech.” Although I might not preserve every line of that opinion, at its core, Huppert got Garcetti right. Two key insights emerge from that case that help illustrate how the majority in this case has gone off track.
First, Huppert correctly appreciated that the Garcetti inquiry is no trifle. Id. at 702-03. Like Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), which asks whether a public employee’s speech is on a matter of public concern, Garcetti delineates the First Amendment’s very scope. Put differently, the speech at issue “must not be expression on-the-job and within the scope of the employee’s duties; if it is, there is no First Amendment protection for the speech.” Erwin Chemerinsky, Constitutional Law: Principles and Policies 1151 (4th ed.2011). Instead, a would-be plaintiffs remedy usually lies in “the powerful network of legislative enactments” that protect whistle-blowers. Garcetti, 547 U.S. at 425, 126 S.Ct. 1951.[1]
Second, Huppert understood that with the “pursuant-to-official-duties” test, the Garcetti Court was charting a clear course that distinguished between citizen-speech and employee-speech. See 574 F.3d at 702.[2] There, the Supreme Court explained that
[the plaintiff] did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, [he] acted as a government employee.
Garcetti 547 U.S. at 422, 126 S.Ct. 1951. The consequence of the citizen/employee dichotomy is that protection in the workplace is to be the exception — not at all the rule. See, e.g., id. at 420, 126 S.Ct. 1951 (“Employees in some cases may receive First Amendment protection for expressions made at work”) (emphasis added); Morales v. Jones, 494 F.3d 590, 598 (7th Cir.2007) (noting that “the purpose of Gar-cetti was to allow government employers greater influence over speech that owes it[s] existence to a public employee’s professional responsibilities”).
With its decision to discard Huppert, and with its newly-minted “guiding principles” for identifying protected speech, the majority opinion reopens doors that Gar- *1085 cetti slammed shut. See Maj. Op. at 1070, 1074-76.
II
A
I cannot agree that “the Huppert majority failed to heed Garcetti’s mandate” about a practical inquiry by taking stock of California courts’ “description of a California police officer’s professional duties.” Maj. Op. at 1070. Here is the entirety of what the Supreme Court said on this issue:
Two final points warrant mentioning. First, as indicated above, the parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee’s duties in cases where there is room for serious debate. .We reject, however, the suggestion that employers can restrict employees’ rights by creating excessively broad job- descriptions. See post, at 1965, n.2 (SOUTER, J., dissenting). The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee’s written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee’s professional duties for First Amendment purposes.[3]
Garcetti 547 U.S. at 424, 126 S.Ct. 1951. This passage appears near the end of the opinion, after the Court announced its conclusion of law and after it applied that holding to the plaintiffs facts. Id. at 420-22, 126 S.Ct. 1951. It is written as a rejoinder to the principal dissent’s worry that “one response to the Court’s holding will be moves by government employers to expand stated job descriptions to include more official duties and so exclude even some currently protectable speech from First Amendment purview.” Garcetti 547 U.S. at 431 n. 2, 126 S.Ct. 1951 (Souter, J., dissenting).
Read in context, this practical-inquiry passage simply directs us not to engage in-a stilted or excessively formulaic inquiry. On the one hand, the Court is explaining that the sort of gamesmanship Justice Souter feared is not to be tolerated. On the other hand, the Garcetti Court is explaining (as cogently expressed by the Sixth Circuit) that “[sjpeech by a public employee made pursuant to ad hoc or de facto duties not appearing in any written job description is nevertheless not protected if it owes its existence to the speaker’s professional responsibilities.” Fox v. Traverse City Area Pub. Sch. Bd. of Educ., 605 F.3d 345, 348 (6th Cir.2010) (alteration and internal quotation marks omitted). The prototypical examples of protected speech are “writing a letter to a local newspaper, as the teacher-plaintiff did in Pickering ” and “discussing politics with a co-worker.” Foley v. Randolph, 598 F.3d 1, 6 (1st Cir.2010) (discussing Garcetti 547 U.S. at 423, 126 S.Ct. 1951). In Garcetti the plaintiff did not engage in these types of actions; instead he “spoke as a prosecutor.” 547 U.S. at 421, 126 S.Ct. 1951. That speech was unprotected because “[w]hen a public employee speaks pursuant to employment responsibilities” there generally is not a “relevant analogue to speech by citizens who are not government employees.” Id. at 424, 126 S.Ct. 1951.
In the case before us, we confront what it means to speak as a police officer. I would not interpret the Supreme Court’s caution against formalism — the “practical-inquiry” passage" from Garcetti — as an ob *1086 stacle to our evaluating a public-employee plaintiffs case against the backdrop of legal and professional-norms. See, e.g., Tamayo v. Blagojevich, 526 F.3d 1074 (7th Cir.2008) (taking notice, in reviewing a motion to dismiss, of the oversight responsibilities of a state legislative committee and of the duties of the administrator of the gaming board); Foley, 598 F.3d at 4 (considering Massachusetts. General Laws ch. 48 § 42, which spells out a fire department' chiefs “powers and duties,” as well as the specific contract that governed the chiefs employment).
B
1
California courts tell us that, “[u]nlike civilians,” that state’s police officers are “expected to prevent others from committing crimes, to assist in the investigation of crime, and to use their law enforcement authority to maintain the trust of the public in its criminal justice system.” People v. Owens, 59 Cal.App.4th 798, 69 Cal.Rptr.2d 428, 430-31 (1997) (upholding a District Attorney’s decision to single out an off-duty police officer.for prosecution for engaging in a pyramid scheme because, in contrast to his civilian confederates, he had “failed to discharge” the “special obligations” of his office).
This principle was first articulated in the canonical case of Christal v. Police Commission of City and County of San Francisco, 33 Cal.App.2d 564, 92 P.2d 416 (1939). See also Titus v. Los Angeles Cnty. Civil Serv. Comm’n, 130 Cal.App.3d 357, 181 Cal.Rptr. 699, 703 (1982) (stating that Christal “enunciated the role of a law enforcement officer.”). “Among the duties of [California] police officers” is the responsibility to disclose “all information known to them which may lead to the apprehension and punishment of those who have' transgressed” their state’s laws. Christal, 92 P.2d.at 419. The case further explained that “[w]hen police officers acquire knowledge of facts which will tend to incriminate any person, it is their duty to disclose such facts to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or- grand jury.” Id. Chris-tal went so far as to say that “[i]t is for the performance of these duties that police officers are commissioned and paid by the community.” Id. (emphasis added); compare with Garcetti, 547 U.S. at 422, 126 S.Ct. 1951 (explaining that when the plaintiff “performed the tasks he was paid to perform” he had “acted as a government employee” (emphasis added)). Dahlia has not marshaled any authority undermining Huppert’s conclusion that police officers still have these obligations when speaking to external law enforcement agencies, such as the county sheriff or FBI. See 574 F.3d at 707.[4]
*1087 My colleagues deride these duties as either relics of a bygone era or judicial musing too naive to credit. See Maj. Op. at 1070 n. 9 (the “passage from Christal relied upon by the Huppert majority reads like a civics textbook”). Yet the California Government Code in force today states that public safety officers may be ordered “to cooperate with other agencies involved in criminal investigations [and] [i]f an officer fails to comply with such an order, the agency may officially charge him or her with insubordination.” Cal. Gov’t Code § 3304. And, numerous California cases have cited the Christal principle over the decades to express “the all-important concept of the peculiar and delicate position police officers hold in society.” Frazee v. Civil Serv. Bd. of Oakland, 170 Cal.App.2d 333, 335, 338 P.2d 943 (1959). As the City of Burbank has argued to us, in a wide variety of settings the unique charge of those tasked with enforcing the criminal laws has overridden other important rights. See, e.g., Titus, 181 Cal.Rptr. at 702-03 (demanding that officers forsake attorney-client privilege in order “to cooperate in a criminal investigation”); Riverside Cnty. Sheriffs Dept. v. Zigman, 169 Cal.App.4th 763, 87 Cal.Rptr.3d 358, 361-62 (2008) (describing “a law enforcement officer’s duty to report criminal activity to his or her employer,” and explaining that the “statutory privilege at issue in this case, must yield when [its] exercise is inconsistent with the performance of the officer’s duties”).
The majority also rejects this “court-created job description applicable to every member of [the] profession” by invoking the specter of employer gamesmanship. Maj. Op. at 1070. Given its seventy-plus year lineage, the .California police officer description of duty could not possibly be a reaction to the Garcetti opinion. Cf. Garcetti 547 U.S. at 431 n. 2, 126 S.Ct. 1951 (Souter, J., dissenting) (“I am pessimistic enough to expect that one response to the Court’s holding will be moves by government employers to expand stated job descriptions____”). More importantly, however, there are legitimate reasons for California to have imposed admittedly exacting obligations on its police. Just as Caesar’s wife must be above reproach, “peace officers have been held to a higher standard than other public employees,” because that is essential to “maintain the public’s confidence in its police force.” Pasadena Police Officers Ass’n v. City of Pasadena, 51 Cal.3d 564, 273 Cal.Rptr. 584, 797 P.2d 608, 611 (1990) (“[T]he public expects peace officers to be above suspicion of violation of the very laws they are sworn to enforce” (internal quotation marks and alterations omitted)).
2
Recently, the Supreme Court recalled that categorical rules have the virtue of keeping “easy cases easy.” Florida v. Jardines, — U.S. -, 133 S.Ct. 1409, 1417, 185 L.Ed.2d 495 (2013). In that spirit, I read Garcetti as fully compatible with a stated obligation of California police officers to report crime — a subset of which is to help expose and to assist in the investigation of crime within their ranks.[5] A California-police-officer plaintiff must engage with “California’s jurisprudence defining such duties.” Hupperi, 574 F.3d *1088 at 707. After all, “the plaintiff bears the burden of showing [his] speech was spoken in the capacity of a private citizen and not a public employee.” Eng, 552 F.3d at 1071.
When as here, a court is called on to evaluate whether a complaint states a First Amendment retaliation claim, it should evaluate its plausibility against this legal landscape. Cf. Morales, 494 F.3d at 598 (“[T]he Milwaukee Police Department requires officers to report all potential crimes. By informing A.D.A. Chisholm of the allegations against Chief Jones and Deputy Chief Ray, Morales was performing that duty as well. Accordingly, his conversation with A.D.A. Chisholm is not protected under the First Amendment after Garcetti.”). In a similar vein, as mentioned above, the Seventh Circuit considered whether a complaint stated a claim for First Amendment retaliation in the context of state-law duties:
Ms. Tamayo’s testimony was given to the House Gaming Committee, a legislative committee responsible for overseeing the activities of the [Illinois Gaming Board], and her testimony involved the alleged wrongdoing of public officials in their attempts to encroach on the agency’s independence. As the Administrator of the agency, she had a duty to see that the law was administered properly. This responsibility encompassed a duty to bring alleged wrongdoing within her agency to the attention of the relevant public authorities — here, the House Gaming Committee.
Tamayo, 526 F.3d at 1091. That administrator sought to “escape the strictures of Garcetti by including in her complaint the conclusory legal statement that she acted ‘as a citizen ... outside the duties of her employment.’ ” Id. at 1092. Appropriately invoking Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the court did not credit these legal conclusions “couched as a factual allegation.” Id.
Similarly, it would be up to a California police officer to “plead[] factual content that allows the court to draw the reasonable inference that” his department imposes less stringent crime-reporting duties on its employees than California courts routinely acknowledge. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).[6] He would need to put at issue that his is a “case[ ] where there is room for serious debate.” Garcetti, 547 U.S. at 424, 126 S.Ct. 1951. Such application of Garcetti is also in line with the rule that, in measuring the sufficiency of a complaint, “the reviewing court [should] draw on its judicial experience and common sense”; it-is eminently logical that officers have precisely the duty that California courts claim they do. Iqbal, 556 U.S. at 679, 129 S.Ct. 1937.[7]
Assuming an- officer’s “well-pleaded facts” do suggest that Christal/Hwppert are a poor fit for his circumstance, id. at 679, 129 S.Ct. 1937, then the case would proceed to summary judgment. At that stage, evidence showing that his duties are truly limited in the fashion he had alleged would need to be proffered. Discovery generally will have unearthed the relevant materials, and then the court would be free to discern which statements, if any, fell *1089 outside the officer’s duties. See, e.g., Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1204-05 (10th Cir.2007) (deciding at summary judgment which statements by teachers passed and failed Garcetti); Charles v. Grief, 522 F.3d 508, 513 n. 17 (5th Cir.2008) (considering the “factual circumstances surrounding the speech at issue” to decide “whether Gar-cetti applies”).
The Court’s mission in Garcetti was to articulate a “screening test a judge should apply” when a government employee tried to invoke the First Amendment. See Gar-cetti 547 U.S. at 445-46, 126 S.Ct. 1951 (Breyer, J., dissenting). Concerned that, in practice, not every police department in California expects its officers to live up to the duties spelled out by its judiciary, the majority decides to screen almost nothing. By contrast, as I have explained, the approach faithful to Garcetti would have been to preserve Huppert as the default presumption, while also acknowledging the possibility that on occasion a police officer might be able to avoid its application.
Ill
With utmost respect to my colleagues in the majority, I find their “guiding principles” about implementing Garcetti similarly untenable. Maj. Op. at 1074.
First, the majority decides that if “a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen.” Maj. Op. at 1074. By contrast, as California courts have made clear,[8] the police have a unique role in society that makes it inappropriate to rely on case law involving other types of public employment to decide that officers’ speech will be protected when delivered “to persons outside the work place,” ie., outside their own police department. Id. at 1074; cf. Kendall Turner, Dahlia v. Rodriguez: A Chance to Overturn a Dangerous Precedent, 65 Stan. L.Rev. Online 59, 63 (2012) (astutely perceiving that “[i]f a janitor cleaning Dahlia’s station had noted the same illegal interrogation tactics, he could presumably enjoy First Amendment protection while reporting them because his job did not require him to expose illegal activity”).[9]
The majority’s third “guiding principle” — an employee is no longer carrying out his professional duties when he does so in the face of a threat or directive by his supervisor to break the law or protocol— follows the Second Circuit’s misguided approach. See Jackler v. Byrne, 658 F.3d 225, 242 (2d Cir.2011). Once again, the majority resorts to the “practical-inquiry” passage for substantiation. Maj. Op. 1075. And once again, we “get[ ] Garcetti backwards.” Bowie v. Maddox, 653 F.3d 45, 48 (D.C.Cir.2011).
There are two key problems with the Second Circuit’s approach that our court adopts today. First, it conflates the “adverse-action” element of a retaliation claim and the “pursuant-to-official-duties” test. Subtly, the Jackler rule allows concern for what happened to a particular plaintiff to color the threshold question about job duties. See Bowie, 653 F.3d at 48 (“[I]t is not difficult to sympathize with the Second Circuit’s dubious interpretation of Garcet-ti The police chiefs instruction to Jackler and the actions he ordered Jackler to take were clearly illegal. But the illegality of a government employer’s order does not *1090 necessarily mean the employee has a cause of action under the First Amendment when he contravenes that order.”).
Second, Jackler’s holding subverts Gar-cetti by not applying the Court’s categorical rule that the protected-status inquiry hinges on job duties, and job duties alone. Jackler involved a police officer who witnessed his sergeant lose his temper and unjustifiably strike an arrestee. 658 F.3d at 230-31. After the officer reported what had happened in a supplemental report, the sergeant pressured him to substitute his honest report for one “which contained false, incomplete and misleading information.” Id. at 231. He refused, and was fired. Id. at 232.
In dismissing his claim under Garcetti, the district court determined that it was “clear on the facts as alleged by Jackler that he refused to withdraw or alter his truthful report in the belief that the proper execution of his duties as a police officer required no less.” Id. at 233. The Second Circuit did not disagree that as a “police officer [he certainly] ha[d] a duty not to substitute a falsehood for the truth.” Id. at 241. But then, instead of applying “Garcetti’s employee-versus-eitizen rule,” the Second Circuit “created a significant exception to it.” Caroline A. Flynn, Note, Policeman, Citizen, or Both? A Civilian Analogue Exception to Garcetti v. Ceballos, 111 Mich. L.Rev. 759, 775 (2013).
Today’s en banc court simply borrows Jackler without discussing its rationale; but as the D.C. Circuit has explained, that case is indefensible. The Second Circuit reasoned that Officer “Jackler’s refusal to comply with orders to retract his truthful Report and file one that was false has a civilian analogue and that Jackler [thus] was not simply doing his job in refusing to obey those orders from the department’s top administrative officers and the chief of police.” Jackler, 658 F.3d at 241-42. The problem with this approach is that while Garcetti did state that its abstract ambition was to protect the kinds of speech for which there is a relevant civilian analogue, 547 U.S. at 424, 126 S.Ct. 1951, the Supreme Court unambiguously settled on a categorical rule as opposed to the potentially more calibrated (but also more subjective) proposals floated in the trio of dissenting opinions. See Bowie, 653 F.3d at 48 (“As all of the dissenting justices recognized, Garcetti categorically denies recovery ... to plaintiffs who spoke pursuant to official duties.” (internal quotation marks and alteration omitted)). The principal dissent puts this matter as plain as can be, explaining that “when a law enforcement officer expressly balks at a superior’s order to violate constitutional rights he is sworn to protect” the majority opinion places this “speaker[ ] beyond the reach of First Amendment protection against retaliation.” Garcetti 547 U.S. at 433, 126 S.Ct. 1951 (Souter, J., dissenting).[10]
I would therefore adopt neither the majority’s “contrary-to-orders” maxim nor its rule about “disclosures outside the chain of command.”
*1091 IV
Remaining now is the application of the foregoing framework to Dahlia’s complaint.
A
1
As for Dahlia’s report to Internal Affairs (“IA”), the majority states “[i]t is possible that Dahlia’s professional duties required him to meet with IA at IA’s insistence, but it is also plausible that Dahlia’s act of meeting with IA was outside his job duties for the purpose of the First Amendment.” Maj. Op. 1077. Under the Supreme Court’s Twombly and Iqbal precedents, it is plaintiffs responsibility to show that his speech qualifies for constitutional protection. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (the Rule 8(a) pleading standard “asks for more than a sheer possibility.... [wjhere a complaint pleads facts that are merely consistent with a defendant’s liability, it stops short of the line between possibility and plausibility of entitlement to relief’ (internal quotation marks omitted)). The majority incants the term “plausible” without pointing to allegations which make it so.
Dahlia’s complaint alleges that IA initiated an investigation and came to interview him three times. Compl. ¶ 36. Dahlia does not say he sought out IA, nor does he claim that he was free either to stay silent when asked about the corruption he had witnessed, or to lie about it. Given the inherent implausibility of that scenario,[11] his complaint most certainly lacks “factual allegations that ‘raise [his] right to relief above the speculative level.’” Tamayo, 526 F.3d at 1092 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955) (alteration in original).
2
Dahlia’s allegations about his “speech” to the County Sheriffs Department are similarly threadbare. The majority concludes that the protected status of his speech likely turns on “whether discovery reveals that Dahlia’s supervisors instructed him to meet with and disclose information to the [sheriff].” Maj. Op. at 1078. Such construction of “pursuant to official duties” is woefully cramped. See, e.g., Foley, 598 F.3d at 6 (“In analyzing whether Foley spoke as a citizen rather than as the Chief of the Fire Department, we first note that it is not dispositive that Foley was not required to speak to the media.”); Brammer-Hoelter, 492 F.3d at 1203 (“[S]peech may be made pursuant to an employee’s official duties even if it deals with activities that the employee is not expressly required to perform.”); Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 694 (5th Cir.2007) (per curiam) (“Simply because Williams wrote memo-randa, which were not. demanded of him, does not mean he was not acting within the course of performing his job.”).
Without the majority’s errant gloss, Dahlia’s allegations fall short. His complaint refers to no facts that suggest, let alone plausibly suggest, that in cooperating with the sheriffs investigation of corruption in the Burbank Police Department he was not “discharging the responsibilities of [his] office, [but instead] appearing as “[John] Q. Public.” ” Tamayo, 526 F.3d at 1092. And as already detailed, the case law and California Government Code Section 3304 indicate that cooperating with an external' law enforcement agency “is a duty he ‘actually [was] expected to perform.’ ” Foley, 598 F.3d at 7 (quoting Garcetti, at 424-25, 126 S.Ct. 1951).[12]
*1092 Thus, I must conclude that Dahlia’s complaint does not state a claim for First Amendment, retaliation upon which relief may be granted.
B
In our circuit, though, Dahlia still would have one more chance to pursue his claim. Although the odds are long, Dahlia could conceivably satisfy the pleading standard as to the protected status of his speech by adding particular allegations about the nature of his crime-reporting duty at the Burbank Police Department. In my view, he would be entitled to be granted leave to amend his complaint, and it is on that narrow basis that I would reverse the judgment dismissing his complaint. See Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir.2000) (en banc) (explaining that the court must “grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts”). I also agree with the majority to the extent that Dahlia’s request for leave to amend to satisfy the adverse action requirement must be honored. Maj. Op. at 1078 nn. 22-23.
V
The malfeasance by officers of the Burbank Police Department which Dahlia witnessed and the threats and intimidation he endured — if true — are shocking and intolerable. Yet we must stay our collective hand, ever mindful that the “Constitution does not provide a cure for every social ill, nor does it vest judges with a mandate to try to remedy every social problem.” Plyler v. Doe, 457 U.S. 202, 253, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (Burger, J., dissenting) (citing Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972)). Alongside his First Amendment cause, Dahlia brought claims under provisions of California law that (1) protect public employees from retaliation for disclosing an abuse of authority or a danger to the public safety, California Government Code § 53298, and (2) that shield employees who complain to a government agency, California Labor Code § 6310. These are the kinds of remedies that the Supreme Court has explained whistleblowers should pursue in the absence of a constitutional claim. See Garcetti 547 U.S. at 425, 126 S.Ct. 1951. However righteous our aims, when we stretch the Constitution to match our sense of justice, we exceed “[t]he judicial power” vested to us in Article III and, by rendering state law nugatory, disserve our federal union.
While I narrowly concur in the judgment, I must respectfully dissent from the court’s erroneous analysis of the First Amendment in this case.

. The lack of a constitutional action may sometimes be for the best, as this "complicated employment law issue ... is much better suited for a legislative solution.” John Q. Mulligan, Note, Huppert, Reily, and the Increasing Futility of Relying on the First Amendment to Protect Employee Speech, 19 Wm. & Mary. Bill Rts. J. 449, 456 (2010). Many questions arise, such as "what types of complaints should be protected, whether internal or external whistleblowing should be protected, and what types of employer responses should be punished." Id. at 468.

. The dissenters in Garcetti, as well the academic literature since, recognize the bright-line nature of the inquiry. See, e.g., Garcetti, 547 U.S. at 432, 126 S.Ct. 1951 (Souter, J., dissenting) (majority "categorically sepa-rares] the citizen’s interest from the employee’s interest”); id. at 427, 126 S.Ct. 1951 (Stevens, J., dissenting) (similar); id. at 446, 126 S.Ct. 1951 (Breyer, J., dissenting) (majority approach described as "absolute”); Chemerinsky, supra, at 1147 (describing Gar-cetti as "a categorical exception from constitutional protection for speech which is on the job in the scope of the employee’s duties”); Caroline A. Flynn, Note, 111 Mich. L.Rev. 759, 761 (2013) (Garcetti "replaced the balancing framework with a bright-line rule”); Monique Alexandra Bair, Garcetti v. Ceballos: Swapping The First Amendment Rights of Public Employees for Greater Government Control, 37 Rutgers L. Rec. 44, 52-55 (2010) (same).

. The second point the Court made is that the Garcetti analysis should not uncritically be applied when academic freedom is involved. See 547 U.S. at 425, 126 S.Ct. 1951.

. California law, in fact, suggests just the opposite. In one case, an Alhambra Police Department Officer who had sexually harassed a motorist went to his union representative for help in dealing with the Los Angeles Sheriff's Department investigation into his misconduct. Alhambra Police Officers Ass’n v. City of Alhambra Police Dep’t, 113 Cal.App.4th 1413, 7 Cal.Rptr.3d 432, 434-35 (2003). In that meeting, the officer disclosed incriminating details; the union representative failed to pass along evidence to his superiors and helped the officer retrieve a document with the driver’s telephone number on it — a violation of several department policies. Id. The California Court of Appeal found that the union representative had an obligation to assist in bringing the officer’s misconduct to light, based on Christal and its progeny. Obviously this broad duty is part of the special responsibility of police and not something characteristic to most other forms of public employment. See, e.g., Davis v. McKinney, 518 F.3d 304, 316 (5th Cir.2008) (explaining it was not within a public university’s "auditor’s job function to communicate with outside police authorities [such as the FBI] or other agencies [such as the Equal Employment Opportunity, Commission] in an investigation”); *1087 Freitag v. Ayers, 468 F.3d 528 (9th Cir.2006) (deciding that it was not part of a correctional officer’s "official tasks to complain to [a] Senator or the [Inspector General] about the state’s failure to perform its duties properly”)-

. See Dahlia v. Rodriguez, 689 F.3d 1094, 1105 (9th Cir.2012) (characterizing Huppert’s rule as one under which "whistleblowing on fellow officers is part of a police officer’s official duties”).

. An officer might do that by describing his employment contract, a collective bargaining agreement, or a (formal or informal) policy limiting his disclosure obligations.

. Simply put, "[t]here is nothing startling in the conception that a public servant’s right to retain his office or employment should depend upon his willingness to forego his constitutional rights and privileges to the extent that the exercise of such rights and privileges may be inconsistent with the performance of the duties of his office or employment.” Christal, 92 P.2d at 419.

. See supra note 7 and accompanying text.

. I would not adopt the majority’s second principle concerning the "subject matter” of speech for the same reason. Maj. Op. at 1074-75. A police officer is not "an average public .employee.” Id.

. Although the academic literature — some of which has been cited in the briefs — has urged us to do otherwise, our duty is to apply Supreme Court precedent fairly rather than whittle it away in a case with sympathetic facts. See, e.g., Turner, supra, at 64 ("While lower courts are of course not free to ignore Garcetti, they are free to — and should — take a narrow view of what constitutes an employee's ‘official duties.' ”); id. at 63 ("Of course, the fundamental problem may be with Garcet-ti itself rather than Huppert.”); Flynn, supra, at 772 (although disposed to the dissenting view as a policy matter, conceding, "in agreement with the D.C. Circuit, that the Second Circuit misapplied Garcetti in Jackler: a civilian analogue exception does not follow from either the language or the logic of that decision”).

. See, e.g., Jackler, 658 F.3d at 241 ("Of course a police officer has a duty not to substitute a falsehood for the truth, i.e., a duty to tell 'nothing but the truth'.... ”).

. Because our court is admonished not to manufacture arguments for parties, unlike the majority, I would not consider Dahlia’s report to the Burbank Police Officers' Association as an alternative form of protected speech. See *1092 United States v. Williamson, 439 F.3d 1125, 1138 (9th Cir.2006); Maj. Op. at 1077. Dahlia has not claimed anything beyond his statements to Internal Affairs, to the sheriff's department, and his unsubstantiated report to the FBI as constitutionally protected speech. Nor, has he even alleged that "the retaliation he faced was directly caused by this act of reporting.” Maj. Op. at 1077.